STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN JOSEPH KOCIOLEK, DEFENDANT-APPELLANT.

Argued November 8, 1955—Decided December 5, 1955.

*Mr. Augustine A. Repetto* argued the cause for appellant (*Mr. Repetto* and *Mr. Joseph Lazarow*, attorneys).

*Mr. David R. Brone* argued the cause for respondent (*Mr. Lewis P. Scott,* Atlantic County Prosecutor, attorney).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. Defendant appeals from his conviction of murder in the first degree for shooting and killing Walter Edwards on December 27, 1954 while riding with Edwards in the latter's truck on Ocean Heights Avenue, near Mays Landing, Atlantic County. The jury did not recommend life imprisonment, and the mandatory death sentence was imposed.

The defendant sought a new trial on the basis of an affidavit of one of the jurors disclosing that the jury arrived at the agreement not to recommend mercy only after some of the jurors recalled, and the entire jury then considered, another indictment against the defendant, not in evidence, to which the defendant, two weeks before the jury was drawn for this trial, pleaded not guilty within the hearing of the jury panel of which they, or several of them, were members. The motion for a new trial was denied on the ground that the jurors could not be heard to say "what they discussed in the course of their deliberations."

The State does not challenge the truth of the contents of the affidavit but meets the defendant's attack upon the trial judge's ruling with the contention that the statements in the affidavits are in no wise probative to support the motion for a new trial but are to be deemed in law to relate the "mental operations" of the jurors not receivable in evidence to impeach the verdict.

The indictment in question charged an alleged offense having no connection whatever with the Edwards murder. It alleged robbery and assault with intent to kill one William Glenn at Absecon on December 27, two days before Edwards was killed.

The jurors retired to consider their verdict about three o'clock in the afternoon of Thursday, April 28, 1955. The juror's affidavit states that within six hours they reached unanimous agreement upon the defendant's guilt. Four hours later, shortly before one o'clock of Friday morning, April 29, the foreman sent the trial judge a note which stated, "The jury agrees that the defendant is guilty but

cannot reach a decision on the chair or life imprisonment." The judge instructed the jurors to continue their deliberations; but finally, at 2:15 A. M., sent them to their hotel for sleep with direction to return and resume deliberations at 11 A. M. They resumed at the appointed time, and returned their verdict of guilty of murder in the first degree, without recommendation of life imprisonment, at 5:45 that afternoon, April 29.

The juror's affidavit states that in the session after 11 A. M. on April 29 when "the jury were eight in favor of life imprisonment and four in favor of the death penalty," "there was injected into the discussion of the problem the assertion by several members of the jury that the defendant was the same as the one who was charged with atrocious assault and battery [sic] on one William Glenn on December 27, 1954, one [sic] day before the date of the commission of the crime which was the subject of the present action * * *. Thereafter, during the course of deliberations, the Glenn incident became a part of these deliberations * * *."

█ The State could not have proved the Glenn indictment at the trial for the purpose of showing that the defendant, being under indictment for allegedly committing another crime of a like nature, would be likely to commit the Edwards murder, *Bullock v. State*, 65 *N. J. L.* 557 (*E. & A.* 1900), or even for the purpose of affecting defendant's credibility when he testified in his own behalf, *State v. De Paola*, 5 *N. J.* 1, 10 (1950); *Roop v. State*, 58 *N. J. L.* 479 (*Sup. Ct.* 1896). Indeed, in *State v. Cooper*, 10 *N. J.* 532, 555 (1952), a new trial was ordered, in part because it appeared that the prosecutor, under guise of attacking the accused's credibility, asked questions intimating the commission of other crimes by the accused without having information that the accused had been convicted of such crimes.

The trial judge was commendably precautious to avoid the chance of reversible error from reference at the trial to the Glenn indictment. In his oral conclusions denying a new trial, he said, "During the entire trial no mention was made by the State, no mention was made by defense counsel,

and the court was ever careful in cooperation with counsel to see that no reference was made in any manner whatsoever to the Glenn incident."

And the jury's action was taken in the face of explicit instructions from the judge, obviously prepared with considerable care, to reach their verdict upon the evidence, and nothing but the evidence. The court's charge was:

"* * * your duty is to render a verdict based upon the evidence to which you have here listened for these past several days, not upon any theory not supported by that evidence but upon the evidence so produced before you. Your verdict is to be a true one based upon that evidence. * * * You are to be guided solely and wholly by the facts and evidence adduced in this case and as you have heard it. *Your verdict is not to be based upon anything else.* You have sworn before God that you would render a true verdict according to the evidence. That is the full measure of your duty in this case. * * *; *you will be unjust in every aspect of the case if you do not determine it solely upon the facts and upon nothing else* * * *." (Emphasis added)

Thus, not only is the law always zealous to protect every accused from a verdict prejudiced by the taint of extraneous influence, but the trial judge here was especially vigilant to protect this defendant from that mishap. It will not be gainsaid that any evidence of the Glenn indictment would be calculated to disparage the defendant in the minds of the jurors. There is general accord that a new trial should be directed upon proof merely that evidence of this sort came irregularly before the jurors and was considered by them, without the court either speculating upon or inquiring into the actual effect of the matter upon their verdict. In *Mattox v. United States,* 146 *U. S.* 140, 13 *S. Ct.* 50, 36 *L. Ed.* 917 (1892), the defendant was sentenced to death for the murder of one John Mullen. The United States Supreme Court held that the trial court erred in denying a new trial, it appearing that during the deliberations one of the jurors brought a newspaper to the jury room and read aloud an account of the trial in which appeared a statement that Mattox was previously tried upon another murder charge or charges. There was also proof that a bailiff in attendance

upon the jury made like statements to some of the jurors. In *State v. McCormick,* 57 *Kan.* 440, 46 *P.* 777 (*Sup. Ct.* 1896), it was held error for the court on a motion for a new trial to refuse to hear evidence that during the jury's deliberations one juror stated that the accused was convicted on a former trial. In *McDougall v. State,* 81 *Tex. Cr. R.* 179, 194 *S. W.* 944, *L. R. A.* 1917E, 930 (1917), a conviction was set aside where it appeared that prior to the discussion by the jury of a former trial and conviction not in evidence ten of the jurors were in favor of fixing punishment at 19 years and two were for a less number of years, and after the discussion the punishment was fixed at 19 years. In *Richards v. State,* 36 *Neb.* 17, 53 *N. W.* 1027 (*Sup. Ct.* 1893), a conviction for rape was reversed where it appeared that during the deliberations of the jury two of its members stated that the accused had ruined other girls and was an improper person to run at large and should be convicted on general principles. In *State v. McChesney,* 114 *Wash.* 113, 194 *P.* 551 (*Sup. Ct.* 1921), a conviction upon prosecution for cattle theft was reversed when it appeared that one of the jurors who had lost some cattle stated his suspicion that the accused was the thief. In *Mitchell v. State,* 36 *Tex. Cr. R.* 278, 33 *S. W.* 367 (1896), a conviction for homicide was set aside where one or two jurors stated after the jury's retirement that the accused had previously killed another man, it appearing that after such statements were made the attitude of the jury changed from a majority in favor of acquittal to a unanimous verdict of conviction. A conviction was set aside in *Nile v. State,* 11 *Lea, Tenn.,* 694 (1883), where it appeared that a juror stated to his fellows that it was very common for the accused to be in court and that he was in court frequently with some charge against him. In *Whitehead v. State,* 115 *Neb.* 143, 212 *N. W.* 35 (*Sup. Ct.* 1927), a conviction of murder in the second degree was set aside when it appeared that after the jury had deliberated for 20 hours without reaching agreement one of the jurors made the statement that the defendant had offered to plead guilty of manslaughter, after which the jury promptly agreed upon a ver-

dict.   Other cases will be found in *Annotations*, at 20 *A. L. R.* 1187, 67 *A. L. R.* 1523; see also 39 *Am. Jur., New Trial, sec.* 81, *p.* 95.

And the result is not different because the matter came into the jurors' discussions after they had agreed upon a verdict of guilt.   It is enough if the extraneous matter has the tendency to increase the penalty or at least "to induce some jurors holding out for a low penalty to agree with their brethren in inflicting a heavier penalty." *Talley v. State,* 102 *Tex. Cr. R.* 401, 278 *S. W.* 195 (*Ct. Cr. App.* 1925).

The early common law set up no barrier against the receipt of jurors' testimony or affidavits to impeach their verdict. 8 *Wigmore, Evidence,* (3d ed. 1940), *p.* 684.   The barrier, apparently insurmountable in its original form however heinous or reprehensible the misconduct of the jury, originated with Lord Mansfield's decision in *Vaise v. Delaval,* 1 *T. R.* 11 (*K. B.* 1785).   Jurors' affidavits of a decision based upon chance were rejected in that case.   Lord Mansfield said:

"The Court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every such case the Court must derive their knowledge from some other source, such as some person having seen the transaction through a window or by some such other means."

The exclusion, thus first based upon a policy against self-stultification, in later decisions, particularly of American courts, was also based upon a policy to avoid encouraging tampering with jurors, perjury and other such fraudulent practices, 15 *Texas L. Rev.* 101, 102 (1936).   A storm of criticism soon surrounded the indiscriminate application of the rule, particularly in fact settings where, as here, it patently worked injustice.   Its critics invariably pointed out its inconsistency from an evidentiary standpoint in that it permitted a bailiff or other court officer who had been spying on the jury to testify as to misconduct, but disallowed the testimony of those who really knew what happened.   *Wigmore, supra, pp.* 686–690.

Too, it was difficult to see why jurors' admissions of misconduct destructive of a verdict should expose them to criminal prosecution and not also be reason for setting aside the contaminated verdict, or how upholding such a verdict would deter attempts at jury tampering, perjury or other fraudulent practices.

In our own State Mr. Justice Rossell, dissenting in 1823 in *Den ex dem. Popino v. McAllister,* 7 *N. J. L.* 46, 52 (*Sup. Ct.* 1823), protested that "many cases might occur where they [affidavits of jurors] ought to be admitted, and there was no other source from which the information they contained could be derived."

However implacably our own cases have applied the rule where jurors attacked their verdict as reached by chance, *Brewster v. Thompson,* 1 *N. J. L.* 32 (*Sup. Ct.* 1790), *Kennedy v. Kennedy,* 18 *N. J. L.* 450 (*Sup. Ct.* 1842), it has otherwise been largely limited to cases in which jurors were attempting to show that they arrived at their verdict by a process of unsound reasoning, as that the court's charge was misunderstood, *Bragg v. King,* 104 *N. J. L.* 4 (*Sup. Ct.* 1928), or an exhibit was misinterpreted, *Marconi v. MacElliott,* 8 *N. J. Misc.* 69 (*Sup. Ct.* 1930). The better reasoned decisions support the exclusion of jurors' testimony as to their mental processes, not upon the discredited basis of the policies against self-stultification and avoidance of jury tampering, perjury or other fraudulent practices, but upon the sounder ground that, being personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore that such testimony should not be received to overthrow the verdict to which all assented. *Wright v. Illinois & M. Telegraph Co.,* 20 *Iowa* 195, 210 (*Sup. Ct.* 1866) ; *Wigmore, supra, p.* 688, and see also *pp.* 668–678. Judge Jayne cogently observed in *Pulitzer v. Martin S. Ribsam & Sons Co.,* 19 *N. J. Misc.* 233, 234 (*Sup. Ct.* 1941), that a verdict in essence represents "the merger of a variety of ideas, reflections and sentiments; a compound in which only the omniscient could identify the component parts and accurately ascribe to each its relative

influence generating the ultimate product. No one but the jurors can tell what was put into it, and the jurors are not permitted to say."

Where, however, jurors' testimony goes, not to the motives or methods or processes by which they reached the verdict, but merely to the existence of conditions or the occurrence of events bearing on the verdict, that basis of policy does not exist, and this whether the condition happens or the event occurs in or outside of the jury room. Evidence of the actual effect of the extraneous matter upon jurors' minds can and should be excluded, as such evidence implicates their mental processes, but receiving their evidence as to the existence of the condition or the happening of the event, particularly when the consequences are governed according to whether capacity for adverse prejudice inheres in the condition or event itself supplies evidence which can be put to the test of other testimony (and thus sound policy is satisfied) and at the same time the evidence can serve to avert, as here, a grave miscarriage of justice, which it is certainly the first duty of a court of conscience to prevent if at all possible. As stated by Justice Brewer in *Perry v. Bailey*, 12 *Kan.* 539, 544 (*Sup. Ct.* 1874):

"As to all those matters lying outside the personal consciousness of the individual juror, those things which are matters of sight and hearing, and therefore accessible to the testimony of others, and subject to contradiction—'overt acts,' as the Massachusetts court expresses it,—it seems to us that the interests of justice will be promoted, and no sound public policy disturbed, if the secret of the jury-box is not permitted to be the safe cover for the perpetration of wrongs upon parties litigant. * * * as to overt acts, they are accessible to the knowledge of all the jurors. If one affirms misconduct, the remaining eleven can deny."

Recent decisions of New Jersey courts have followed this view. Jurors' testimony as to objective events has been admitted whether occurring within or outside the jury room, and relief from verdicts has been granted if, but only if, prejudice inhered on the face of the matter; jurors' testimony has been disregarded in such cases, however, to the

extent it attempts to explain the actual effect of the occurrence upon the verdict. *Capozzi v. Butterwei*, 2 *N. J. Super.* 593 (*Law Div.* 1949) ; *Palestroni v. Jacobs*, 10 *N. J. Super.* 266 (*App. Div.* 1950) ; *Panko v. Flintkote Co.*, 7 *N. J.* 55 (1951) ; and see the very old decision of *Den ex dem. Chews v. Driver*, 1 *N. J. L.* 193 (*Sup. Ct.* 1793).

In *Titus v. State*, 49 *N. J. L.* 36 (*Sup. Ct.* 1886), relied on by the State, the court considered the testimony of jurors that a magnifying glass was obtained from a jeweler to aid in the examination of certain exhibits but found that no prejudice resulted to the accused from that act. This is the true rationale of that decision despite the question raised in the concluding paragraph of the opinion as to the propriety of taking the testimony of jurors. And similar language, questioning the legality of the testimony of jurors for any purpose, in the opinions in *Deacon v. Shreve*, 22 *N. J. L.* 176, 181 (*Sup. Ct.* 1849), and *State v. Van Sciver*, 7 *N. J. L. J.* 268 (*Quarter Sess.* 1884), has no controlling force in light of the fact that new trials were ordered in those cases, although professedly upon the basis of the testimony of non-jurors showing the jurors' misconduct. .

In *Capozzi v. Butterwei, supra,* a verdict was set aside upon the testimony of jurors that one of their number visited the scene of the accident after the trial had been adjourned for the day. Judge William A. Smith held (2 *N. J. Super.* 595) :

"We cannot inquire what effect the acquired knowledge had on the individual juror or his co-jurors when his knowledge has been communicated to them, but in this case we have proof of knowledge acquired by the juror during the trial of the case which was not disclosed in the course of the trial. This would permit the determination of the case on the action of one of the jurors based upon independent knowledge acquired by the juror outside the trial."

In *Palestroni v. Jacobs, supra,* the jurors requested, and the trial judge supplied, a dictionary which the depositions of the jurors, subsequently taken, established was used by them to ascertain the meaning of the word "wainscot," an issue being considered by them in connection with a claim

under a building contract. It was there held (10 *N. J. Super.* 271 *et seq.*):

"* * * It follows a definition of 'wainscot' was capable of influencing the jury in its consideration of the specification. However small the part played by the specification in the entire verdict, the whole of the verdict was infected by the taint of illegal and extraneous evidence having the capacity to influence the determination. The rule is well settled that, * * * the test whether a new trial will be granted is whether the extraneous matter could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the extraneous matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The stringency of the rule is not mere formalism; the rule is 'imperatively required to secure verdicts based on proofs taken openly at the trial, free from all danger of extraneous influences' * * *. On elementary principles the jury's verdict must be obedient to the court's charge and be based solely on legal evidence properly before the jury.

*     *     *     *     *     *     *     *

It is no answer the jury may think they were not influenced by the definition. The law holds it is impossible for them to say what effect it had on their minds. * * * The test is capacity of the irregular matter to influence, not whether influence in fact resulted. * * *

*     *     *     *     *     *     *     *

We have not overlooked the point made by counsel for the defendant that the jurors' depositions were not competent evidence for any purpose on his motion for a new trial.

* * * True, the depositions did elicit the jurors' testimony whether their verdict was influenced by the definition and it is plain the depositions to that extent were wholly incompetent; it is against the policy of the law to receive the affidavits of jurors to show or explain the reasons or the methods of the jurors or any of them in giving or consenting to the verdict or 'what was put into it.'

*     *     *     *     *     *     *     *

Jurors may state, however, whether the dictionary was requested, received or used by them."

The principle underlying these decisions also underlies recommended Rule 41 of the *Uniform Rules of Evidence* considered in the Report of the Supreme Court's Committee on the Revision of the Law of Evidence (1951), *p.* 88; see also 90 *A. L. R.* 249. Proposed Rule 41 is:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

As noted in the Committee's annotation, Rule 41 "does not prevent a juror from testifying as to the existence of conditions or the occurrence of events bearing upon the verdict. It merely prevents testimony as to the effect upon the juror of such conditions or occurrences. The New Jersey view is in accord." See also recommended Rule 44, at *page* 91 of the Committee's Report, which, consistent with the holding in the *Palestroni* case, *supra,* provides that "These rules shall not be construed to (a) exempt a juror from testifying as a witness, if the law of the state permits, to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by *Rule* 41; * * *." And it should be remarked that in the instant case the event which set in motion the chain of events leading up to the jurors' consideration of the Glenn indictment occurred outside the jury room two weeks before the jury was chosen and the trial begun. The presence of the jury panel in the courtroom when defendant's plea was taken was confirmed in depositions of court officers also filed in support of the motion for a new trial.

█ It is evident that the juror's affidavit here was competent evidence at least as to the excerpts therefrom quoted in the fore part of this opinion. The statements therein as to the actual effect of the consideration of the indictment upon the jurors' minds must, however, be rejected, and we have neither quoted such statements nor relied upon them in reaching our conclusion. It suffices that the intrusion of the Glenn incident into the jurors' deliberations, standing alone, introduced illegal and extraneous evidence fraught with peril for the defendant, an action the more grievous because taken in disregard, actually in defiance, of the explicit instructions of the trial judge. Since the law would

have allowed a new trial if such extraneous prejudicial matter was erroneously admitted in evidence at the trial, it cannot tolerate the defeat of justice which would result from the indefensible exclusion of the juror's testimony as to the incident, where the matter came into the jurors' deliberations despite the commendable effort of court and counsel to prevent the mishap, and the jurors considered it, in violation of the court's instructions and of their oaths. As Mr. Justice Heher observed in *Hager v. Weber*, 7 N. J. 201, 210 (1951) :

"* * * There is no essential difference between a verdict that comes from misdirection and a verdict that constitutes a palpable perversion of the jury function."

It is true, as the State argues, that motions for new trial are directed to the sound discretion of the trial judge and his determination is not to be lightly disturbed by an appellate court. But here the trial judge did not reach the point of exercising discretion, but rejected the juror's affidavit as incompetent in its entirety to invoke that discretion. In that circumstance, the conclusions of Chief Justice Fuller, speaking for the United States Supreme Court in *Mattox v. United States, supra* [146 U. S. 140, 13 S. Ct. 52], are especially pertinent and dispositive of the State's contentions. He said:

"The allowance or refusal of a new trial rests in the sound discretion of the court to which the application is addressed, * * *, but in the case at bar the district court excluded the affidavits, and, in passing upon the motion, did not exercise any discretion in respect of the matters stated therein.

* * * * * * * *

There is, * * *, a recognized distinction between what may and what may not be established by the testimony of jurors to set aside a verdict.

* * * * * * * *

The subject was much considered by *Mr. Justice* Gray, then a member of the supreme judicial court of Massachusetts, in *Woodward v. Leavitt*, 107 *Mass.* 453, where numerous authorities were referred to and applied, and the conclusions announced 'that, on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts

bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. * * *'

We regard the rule thus laid down as conformable to right reason and sustained by the weight of authority. These affidavits were within the rule, and, being material, their exclusion constituted reversible error. * * *

* * * * * * *

It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.

* * * * * * * *

* * . * It is not open to reasonable doubt that the tendency of that article [the newspaper account] was injurious to the defendant. Statements that the defendant had been tried for his life once before; that the evidence against him was claimed to be very strong by those who had heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict,—could have no other tendency. Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion. We should therefore be compelled to reverse the judgment because the [jurors'] affidavits were not received and considered by the court, * * *."

Defendant urges other points for reversal, namely, alleged error in the suspension of the jury's deliberations from 2:15 A. M. to 11 A. M. on April 29, the admission of defendant's several confessions into evidence, the admission of the testimony of Mrs. Edwards concerning certain telephone calls, and alleged error in the charge directing the jury to give no consideration to a verdict of murder in the second degree. Upon the record before us, none has merit either as an abstract proposition of law or, in the circumstances appearing, as showing prejudice to defendant's rights. The situation may or may not be different on the new trial, and the determination of these questions, if they again arise, should in the first instance be made by the trial judge in the setting then presented.

Reversed with direction for a new trial.

106

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, JACOBS and BRENNAN—4.

*For affirmance*—Justices OLIPHANT, WACHENFELD and BURLING—3.