[Crim. No. 13154. In Bank. June 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT BEE HUTCHINSON, Defendant and Appellant.

Don Edgar Burris, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert T. Jacobs, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant Robert Bee Hutchinson was accused by information of possession of marijuana for sale, and a jury found him guilty of the lesser included offense of possession of marijuana. (Health & Saf. Code, § 11530.) He appeals from the order granting probation and from the order denying a new trial. The latter appeal is dismissed. (Pen.

Code, § 1237.) Defendant contends that the evidence is insufficient to support the verdict and that the trial court committed prejudicial error in instructing on flight and in refusing to consider the affidavit of a juror in ruling on the motion for new trial.

Defendant lived at his mother's and stepfather's home and shared a bedroom with two brothers and a stepbrother. For about a week before July 25, 1966, only defendant and one brother occupied the bedroom, since the other two boys were away on vacation. On that date, while cleaning the bedroom and its closet, defendant's mother discovered a box containing stems and green plant material that appeared to her to be roots. She was unable to identify the clothing that covered the box as belonging to any one of the boys and testified that "it had to belong to all of the boys, because it's there where they throw their real dirty clothes."

She continued cleaning and discovered another box under defendant's bed. Defendant's brother Ronnie, who was then 16 years old, also used the same bed from time to time. The contents of the second box resembled tobacco leaves, but Mrs. Long could not tell what they were. At the trial it was established that both boxes contained marijuana. After discovering the second box Mrs. Long became suspicious. When defendant came home with his stepfather after work about 5 o'clock in the afternoon, Mrs. Long told her husband about the boxes while defendant was in another room. She then called defendant to the living room and accused him of knowing to whom the boxes and their contents belonged because she felt "that he's the oldest of the children [he was then 18 years old] and when we're not at home, he's responsible. And I was screaming at him, you know, and things, really was. . . . I told him if he didn't tell me where it came from, I was going to call the police." Defendant replied that "it wasn't his and he didn't know anything about it." Defendant and his mother became emotional and began to cry. Defendant said to his stepfather, "God, dad, do something with mother. I can't stand this." He then left the living room and went toward his bedroom.

About 25 minutes later Mrs. Long called the police, who arrived within half an hour. Defendant had left the house through his bedroom window. About half an hour after the police had left with the boxes, defendant called his home from a telephone some five blocks away and asked his stepfather if his mother was all right. Mr. Long replied that she had

"calmed down" and that "We called the police." Defendant asked, "Well, you want me to come home?" and Mr. Long replied "No, no. I'll come and get you." He did so, and the next morning defendant and Mr. and Mrs. Long went to the police station, where defendant was placed under arrest.

Defendant testified that he had not seen the two boxes at any time until he came home on the day his mother confronted him with them. He had never seen any of his brothers with material like that found in the two boxes and had never seen marijuana in his home. He admitted that he had seen marijuana in cigarettes at other places and knew that it was a green leafy substance similar to tobacco. He further testified that his mother did not tell him that she was going to call the police and that he did not hear her call them. He left the house by going out the window only to avoid further conflict with his mother.

On the evening before the discovery of the marijuana, friends of defendant and his brothers and sisters had visited the Long house for a swimming party. Mr. and Mrs. Long went out and left defendant in charge. The boys who attended such swimming parties dressed and undressed in the Long boys' bedroom. Defendant's brother Ronnie had been away on vacation for several days but returned after defendant was arrested. When told that defendant was to be released on bail and was coming home, Ronnie left the house, ostensibly to go to school, but instead to stay with his father in Oklahoma.

The evidence was sufficient to support the verdict. "Unlawful possession of narcotics is established by proof (1) that the accused exercised dominion and control over the contraband, (2) that he had knowledge of its presence, and (3) that the accused had knowledge that the material was a narcotic." (*People* v. *Groom* (1964) 60 Cal.2d 694, 696 [36 Cal.Rptr. 327, 388 P.2d 359].) When contraband is found in a place to which a defendant and others have access and over which none has exclusive control "no sharp line can be drawn to distinguish the congeries of facts which will and that which will not constitute sufficient evidence of a defendant's knowledge of the presence of a narcotic. . . ." (*People* v. *Redrick* (1961) 55 Cal.2d 282, 287 [10 Cal.Rptr. 823, 359 P.2d 255].)

If the evidence showed only that two boxes containing marijuana were found hidden in the closet and under a bed in a bedroom defendant shared with his brothers and to

which guests also had access, the applicable rule would be that "proof of opportunity of access to a place where narcotics are found, without more, will not support a finding of unlawful possession." (*People* v. *Redrick, supra,* 55 Cal.2d 282, 285.) There was more in this case, however; for defendant fled from his home when his mother confronted him with the marijuana, demanded an explanation, and threatened to call the police.

 The jury was not required to accept defendant's explanation that his flight was motivated only by a wish to escape from his mother's emotional outburst. The jury could reasonably infer that his flight reflected consciousness of guilt and that he therefore knowingly possessed the marijuana found in the bedroom and closet. It follows that the trial court did not err in instructing the jury on the significance of flight pursuant to Penal Code section 1127c.

In support of his motion for a new trial defendant submitted an affidavit of a juror alleging misconduct on the part of the bailiff.[1] The trial court refused to consider the affidavit on the ground that: "They [the jury] can't impeach their own verdict."

The rule that jurors cannot impeach their verdicts, although almost universally assailed by the commentators as

---

[1] "I hereby certify and declare that I was a juror on the above-entitled case and that the following is my recollection of the activities of the bailiff in regard to this case.

"The Judge stated from the Bench that we would go to dinner at 6:00 p.m., if we had not reached a verdict. At 6:00 p.m. we were not taken to dinner.

"It was not until about 6:30 when the bailiff came in, and at our request. At this time inquiry of him was made as to when we would get to dinner. At this point he replied words to the effect: 'If you go out to eat; you will be locked up overnight.' At some time during the deliberations in the late afternoon, after 6:30, the bailiff came in and said words to this effect: 'If you knew what was going on out there, you would be shivering in your boots.' At one time when he entered, around 7:00, he seemed quite angry and put out. He said words, 'This is it.' We replied, 'Give us a few more minutes and we can come to a verdict.' He gave us about five or ten minutes and said if we had not reached a verdict that was it. I feel that we were definitely rushed by the bailiff. When the bailiff came in the last time, I felt we just had to make up our minds and that was it when he came in. He had come in three times and each time he seemed and spoke in a more angry manner. It was my opinion that the entire jury was uncertain as to how to proceed. As a result of his actions, everyone said, 'Hurry up.' It is my opinion that I hurried my verdict and agreed to the compromise verdict in order to prevent the jury from being locked up overnight.

"There were about four of us who felt from the beginning of deliberations that he was not guilty. I was the last holdout on the jury. The verdict for the lesser included was my verdict and was the verdict of the entire jury. I heard no vulgarity. I would not desire to sit on another jury if it was handled in the same way that this jury was handled by the bailiff."

without foundation in logic or policy,[2] has been a common law rule in this state since our first volume of reports. (See *People* v. *Baker* (1851) 1 Cal. 403.) The rule first sprang full blown and unprecedented[3] from the opinion of Lord Mansfield in *Vaise* v. *Delaval* (1785) 1 T.R. 11, 99 Eng. Rep. 944, and was based on an extension of the principle *nemo turpitudinem suam allegans audietur*—no man shall be heard to allege his own turpitude.[4] With several exceptions, the rule was adopted by the courts in American jurisdictions, including California, even though the principle on which it was originally based was largely repudiated as applied to other areas of the law of evidence. (See 8 Wigmore, Evidence (McNaughton rev. 1961) § 2352, p. 696.)

The erroneous view that the California rule is statutory (see *People* v. *Gidney* (1937) 10 Cal.2d 138, 146 [73 P.2d 1186]) had its roots in *Boyce* v. *California Stage Co.* (1864) 25 Cal. 460, 475. Before 1862, the rule was not reflected in any statute but was based on the court's view of public policy. (See *People* v. *Baker* (1851) 1 Cal. 403; *Amsby* v. *Dickhouse* (1854) 4 Cal. 102; *Wilson* v. *Berryman* (1855) 5 Cal. 44 [63 Am.Dec. 78].) In 1862, apparently in reaction to a scandal, the Legislature amended section 193 of the Practice Act (now § 657 of Code Civ. Proc.) to provide that verdicts obtained by "resort to the determination of chance" might be impeached by affidavits of the jurors. (Stats. 1862, ch. 48, § 1, p. 38; see *People* v. *Ritchie* (1895) 12 Utah 180, 194 [42 P. 209].) The court in *Boyce* found that in creating the exception to the general rule, the Legislature "upon the maxim, *expressio unius, exclusio alterius est,* has declared that verdicts of a different class shall not be so impeached." (*Boyce* v. *California Stage Co., supra,* 25 Cal. 460, 475.) This reading of the statute was followed in *People* v. *Azoff* (1895) 105 Cal. 632, 634 [39 P. 59], and later cases. (E.g., *People* v. *Reid* (1924)

---

[2]See Maguire, Evidence, Common Sense and Common Law (1947) 89-90; 8 Wigmore, Evidence (McNaughton rev. 1961) §§ 2345-2354; Note (1956) 56 Colum.L.Rev. 952; Note (1947) 47 Colum.L.Rev. 1373; Leavitt, *The Jury at Work,* 13 Hastings L.J. (1962) 415, 445-446; Note (1959) 10 Hastings L.J. 319; Note (1956) 54 Mich.L.Rev. 1003; Note (1948) 47 Mich.L.Rev. 261; Note (1915) 64 U.Pa.L.Rev. 86; Falknor, *Extrinsic Policies Affecting Admissibility* (1956) 10 Rutgers L.Rev. 574, 597-598; Note (1958) 25 U.Chi.L.Rev. 360; Note (1951) 37 Va.L.Rev. 849, 862; Note (1966) 41 Wash.L.Rev. 346. See contra Note (1955) 43 Cal.L.Rev. 729.

[3]See earlier cases to the contrary cited and discussed in 8 Wigmore, Evidence (McNaughton rev. 1961) § 2352, pp. 696-697, fn. 2.

[4]The jurors in *Vaise* v. *Delaval* had reached their verdict by lot, conduct that Lord Mansfield classed as a very high misdemeanor.

195 Cal. 249, 261 [232 P. 457, 36 A.L.R. 1435]; *People* v. *Gidney, supra,* 10 Cal.2d 138, 146.)

█ Although purporting to recognize legislative preemption of the field, the court in *Gidney* also acknowledged the existence of the judicial exception to the rule that allows jurors' affidavits to be used to prove that one or more of the jurors concealed bias or prejudice on *voir dire.* (*People* v. *Gidney, supra,* 10 Cal.2d 138, 146; see *Williams* v. *Bridges* (1934) 140 Cal.App. 537 [35 P.2d 407].) This exception is now well settled (see e.g., *Kollert* v. *Cundiff* (1958) 50 Cal.2d 768, 773-774 [329 P.2d 897]; *People* v. *Castaldia* (1959) 51 Cal.2d 569, 572 [335 P.2d 104]) and has been extended to allow the use of juror affidavits to show that a juror was mentally incompetent at the time of trial (*Church* v. *Capital Freight Lines* (1956) 141 Cal.App.2d 246, 248 [296 P.2d 563]) and to show that a juror did not intend to follow the court's instructions on the law and had concealed that intention on *voir dire.* (*Noll* v. *Lee* (1963) 221 Cal.App.2d 81 [34 Cal.Rptr. 223].)

Thus the courts have not followed the view that the Legislature has enacted the common law rule, but on the contrary have made changes in the rule they deemed dictated by experience and justice. The Legislature has never sought to restrict the power of the courts to enlarge the area in which jurors may impeach their verdicts. The rule owes its continuing vitality, not to statute, but to the force of stare decisis (see *Sopp v. Smith* (1963) 59 Cal.2d 12, 15-16 [27 Cal.Rptr. 593, 377 P.2d 649] (dissenting opinion, Peters, J.); *People* v. *Azoff, supra,* 105 Cal. 632, 634) and to a variety of legal arguments and public policies that, like the discredited policy against self-stultifying testimony, cannot withstand careful analysis.

In *Kollert* v. *Cundiff, supra,* 50 Cal.2d 768, 773-774, we stated the rationale presently underlying the rule: ''The problem involves the balancing of two conflicting policies. It is, of course, necessary to prevent instability of verdicts, fraud, and harassment of jurors, and, on the other hand, it is desirable to give the losing party relief from wrongful conduct by the jury. The court in *McDonald* v. *Pless,* 238 U.S. 264, 267-269 [59 L.Ed, 1300, 1302-1303, 35 S.Ct. 783], after discussing these policies and stating that the wrong to the individual was the lesser of two evils, concluded that as a general rule the affidavits [of jurors] should be excluded but that there might be instances where the rule could not be

applied without 'violating the plainest principles of justice.' " (See also, *Saltzman* v. *Sunset Tel. etc. Co.* (1899) 125 Cal. 501, 504-505 [58 P. 169]; *People* v. *Azoff, supra,* 105 Cal. 632, 635.) Upon further deliberation we have concluded that there is no substantial conflict of policies and that the wrong to the individual cannot be considered the lesser of two evils.

In the Evidence Code the Legislature has determined that certain facts may be proved to impeach a verdict. "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).) This distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, has been advocated by commentators (se e.g., 8 Wigmore, Evidence (McNaughton rev. 1961) §§ 2349, 2352-2354; Note (1956) 56 Colum.L.Rev. 952; Note (1959) 10 Hastings L.J. 319; Note (1956) 54 Mich.L.Rev. 1003; Note (1948) 47 Mich.L.Rev. 261), adopted by the Uniform Rules of Evidence (rules 41 and 44) and the Model Code of Evidence (rule 301), and has been the basic limitation on proof set by the leading decisions allowing jurors to impeach their verdicts. (See *Wright* v. *Illinois & Miss. Tel. Co.* (1866) 20 Iowa 195; *Perry* v. *Bailey* (1874) 12 Kan. 415, 418-419; *State* v. *Kociolek* (1955) 20 N.J. 92, 99-103 [118 A.2d 812, 58 A.L.R.2d 545]. See also, *People* v. *Stokes* (1894) 103 Cal. 193, 196-197 [37 P. 207, 42 Am.St.Rep. 102]; Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates (1969) Rule 6-06 and Advisory Committee's Notes, pp. 117-119.)

Although section 1150 does not alter the rule against impeachment of a verdict by the jurors,[5] its limitation of impeachment evidence to proof of overt conduct, conditions, events, and statements, as suggested by the commentators, vitiates the major policy arguments supporting the common

---

[5]Section 1150, subdivision (b), reads as follows: "Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."

law rule. (See *Sopp* v. *Smith, supra,* 59 Cal.2d 12, 15-20 (dissenting opinion, Peters, J.).) This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. ██ The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration. (See Note (1956) 54 Mich.L.Rev. 1003, 1005; *Perry* v. *Bailey* (1874) 12 Kan. 415, 419.) " [T]hese facts can be easily proved or disproved. There is invariably little disagreement as to their occurrence." (Report of the New Jersey Supreme Court Committee on Evidence (1963) 80.) Experience in other jurisdictions that recognize the competency of a juror to impeach his verdict indicates that the admission of jurors' affidavits within the limits set by section 1150 will not result in the widespread upsetting of verdicts. (See Note (1958) 25 U.Chi.L.Rev. 360, 372, fn. 78; Note (1951) 37 Va.L.Rev. 849, 862.) Experience in this state with the present exceptions "indicates that the fears of jury tampering are unrealistic" (6 Cal. Law Revision Com. Reports (1964) 611), and there is no reason to believe that permitting proof of other overt misconduct is more likely to encourage post verdict tampering with the jury than do the present exceptions.

Admission of jurors' affidavits within the limits set by section 1150 protects the stability of verdicts, and allows proof by the best evidence of misconduct on the part of either jurors or third parties that should be exposed, misconduct upon which no verdict should be based. (See Pen. Code, § 1181; Code Civ. Proc., § 657.) The content and conduct of deliberations may already be exposed by jurors at the trial of one who attempted corruptly to influence the verdict, or, in the case of the present two exceptions to the rule, at motion for new trial. Admission of this best evidence of misconduct or improper influence at a motion for new trial, therefore, would not present a breach in the post verdict privacy of jury deliberations. It would merely insure that evidence of misconduct will be available to the courts, freeing them to determine the substantive questions of whether the particular misconduct is a recognized ground for new trial and whether it has prejudiced the losing party. Admission of jurors' affidavits should also have a further prophylactic effect of stripping from all prejudicial misconduct whatever veil of post verdict secrecy is now reserved for the proper deliberations of the jury. " [T]o

hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them." (*Wright* v. *Illinois etc. Tel. Co., supra,* 20 Iowa 195, 211.)

■ We therefore hold that jurors are competent witnesses to prove objective facts to impeach a verdict under section 1150 of the Evidence Code. To the extent that *Sopp* v. *Smith, supra,* 59 Cal.2d 12, *Kollert* v. *Cundiff, supra,* 50 Cal.2d 768, and similar cases are contrary to our conclusion herein, they are overruled.

■ The bailiff's remarks and the tone of their delivery constitute statements and conduct that are "likely to have influenced the verdict improperly." (Evid. Code, § 1150; see *People* v. *Gidney, supra,* 10 Cal.2d 138, 146.) The affidavit of the juror is therefore admissible to prove the statements and conduct of the bailiff. Since the trial court refused to consider this competent evidence, defendant is entitled to a redetermination of his motion for new trial.

The order granting probation and the order denying the motion for new trial are vacated with directions to the trial court to hear and determine the motion for new trial in accordance with this opinion and to take such further proceedings as are appropriate.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied July 16, 1969.