[Crim. No. 24137. Nov. 25, 1985.]

In re LAIRD GENE STANKEWITZ on Habeas Corpus.

392

## COUNSEL

Frank O. Bell, Jr., State Public Defender, Roy M. Dahlberg, Deputy State Public Defender, and Quin Denvir for Petitioner.

John K. Van de Kamp, Attorney General, Michael D. Wellington and Robert M. Foster, Deputy Attorneys General, for Respondent.

## OPINION

**MOSK, J.**—Petitioner Laird Gene Stankewitz seeks a writ of habeas corpus after he was convicted of first degree murder and robbery and sentenced to death. His automatic appeal from that judgment is pending in this court. (Pen. Code, § 1239, subd. (b).) In this proceeding he contends he was denied a fair trial because one of the jurors introduced erroneous "law" on a crucial issue into the guilt phase deliberations. We conclude the contention is meritorious and hence the judgment must be vacated.

The events leading to the judgment, insofar as relevant to this petition, are undisputed.

Petitioner was holed up in a cabin in a remote canyon. A few months earlier he had escaped from county jail, and was being actively sought by

the police. On the day in question, Scott Whelan and Richard Burrell approached petitioner's cabin and called out to him to unlock a gate that barred their way up a road. Petitioner walked toward the men, who said they were on a camping trip; he inquired what they did for a living; he asked to see some identification, and leafed through the identification cards and money in their wallets. After they talked for a while, petitioner opened the gate and the three went up the road together.

Later, after petitioner had consumed some alcohol and smoked some marijuana, he pointed a gun at Whelan and Burrell and ordered them to hand over their wallets. They complied, and petitioner again leafed through the identification cards and money in each wallet. When Whelan said, "This is all the money we have for our trip. Why are you going to take it all?" petitioner replied, "*I am not going to take your money.*" (Italics added.) He threw the wallets at their feet, and at his direction they picked them up. Petitioner, obviously concerned that his visitors were law enforcement officers, next made some remark about the two being "pigs" or working for "pigs," and said: "Okay, you guys, I want some good answers and I want them fast. What are you doing up here? What are you really doing up here? No one comes up here for a vacation." The two insisted they had indeed come for a vacation. Petitioner then suddenly shot Burrell; Whelan ran and escaped.

While preparing the automatic appeal, petitioner's appellate counsel fortuitously received information that led him to obtain declarations of Marian Sparks and James F. Barbieri, who had served as jurors in the case. Each declaration stated in substance as follows: on several occasions during the guilt phase deliberations Juror Louis Knapp advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them.

██ ██ ██ Petitioner now seeks a writ of habeas corpus, contending that he was denied a fair trial by reason of such juror misconduct.[1]

---

[1]Stressing the fact that petitioner filed his petition almost a year and a half after he obtained the declarations, the People contend in effect that the petition is untimely. In a habeas corpus proceeding, it is true, the petitioner must justify any substantial delay in seeking relief. (*People* v. *Jackson* (1973) 10 Cal.3d 265, 268 [110 Cal.Rptr. 142, 514 P.2d 1222], and case cited.) Assuming that on the facts of this case the delay was substantial, petitioner

■ When extraneous law enters a jury room—i.e., a statement of law not given to the jury in the instructions of the court—the defendant is denied his constitutional right to a fair trial unless the People can prove that no actual prejudice resulted. (*Noll* v. *Lee* (1963) 221 Cal.App.2d 81, 87-94 [34 Cal.Rptr. 223]; accord, *State* v. *Sinegal* (La. 1981) 393 So.2d 684, 686-687; cf. *Mattox* v. *United States* (1892) 146 U.S. 140, 149-151 [36 L.Ed. 917, 920-921, 13 S.Ct. 50] [extraneous factual material].) This rule has special force in capital cases, in which "[i]t is vital . . . that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." (*Id.* at p. 149 [36 L.Ed. at p. 921].)

■ Although jury misconduct during deliberations is most often raised by motion for new trial and appeal (see, e.g., *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 346 [78 Cal.Rptr. 196, 455 P.2d 132]), it may also be alleged as a ground of habeas corpus (see, e.g., *In re Winchester* (1960) 53 Cal.2d 528, 531-532 [2 Cal.Rptr. 296, 348 P.2d 904]). ■ The threshold question is whether evidence of such misconduct may be received from the jurors themselves.

■ The Legislature has declared that evidence of certain facts is admissible to impeach a verdict: "Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received as to statements made,* or conduct, conditions, or events occurring, either within or without the jury room, *of such a character as is likely to have influenced the verdict improperly.*" (Evid. Code, § 1150, subd. (a), italics added.) It is settled that jurors are competent to prove "objective facts" under this provision. (*People* v. *Hutchinson, supra,* 71 Cal.2d at p. 351.) By contrast, the Legislature has declared evidence of certain other facts to be inadmissible for this purpose: "No evidence is admissible to show the *effect* of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a), italics added.)

makes the requisite showing: reading *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587], and *People* v. *Pope* (1979) 23 Cal.3d 412, 426-427, footnote 17 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], as approving the course he took, petitioner waited to file his petition simultaneously with the opening brief in his automatic appeal in order to present his claim in light of the record.

Underlying the People's complaint, however, is a legitimate concern that a habeas corpus petition should be filed as promptly as the circumstances of the case allow. (See, e.g., *People* v. *Jackson, supra,* 10 Cal.3d at p. 268.) Hereafter, one who seeks extraordinary relief should not rely on a narrow reading of *Frierson* and *Pope*; rather, he must point to particular circumstances sufficient to justify substantial delay, as we have long required.

Thus, jurors may testify to "overt acts"—that is, such statements, conduct, conditions, or events as are "open to sight, hearing, and the other senses and thus subject to corroboration"—but may not testify to "the subjective reasoning processes of the individual juror . . . ." (*People v. Hutchinson, supra,* at pp. 349-350.)

■■■ Among the overt acts that are admissible and to which jurors are competent to testify are statements. Section 1150, subdivision (a), expressly allows proof of "statements made . . . either within or without the jury room . . . ." In *People v. Pierce* (1979) 24 Cal.3d 199, 208 [155 Cal.Rptr. 657, 595 P.2d 91], we held that jurors may testify to such statements.

Although this evidence may be received, it must be admitted with caution. Statements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors—e.g., what the juror making the statement meant and what the juror hearing it understood. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny. But no such misuse is threatened when, as here, the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 410 [185 Cal.Rptr. 654, 650 P.2d 1171]), or a juror's consultation with an outside attorney for advice on the law applicable to the case (*People v. Honeycutt* (1977) 20 Cal.3d 150, 154-158 [141 Cal.Rptr. 698, 570 P.2d 1050]).[2]

■■■ We must next decide whether the statement of Juror Knapp related in the declarations constituted misconduct. (See, e.g., *People v. Pierce,*

---

[2]Our conclusion is reinforced by constitutional considerations. (See *Parker v. Gladden* (1966) 385 U.S. 363, 363-366 [17 L.Ed.2d 420, 422-423, 87 S.Ct. 468]; see also 3 Weinstein, Evidence (1982) ¶ 606[04], p. 606-27 [*Parker* "suggests that in criminal cases, at least, [fn. omitted] constitutional rights may require inquiry into the circumstances regarding a jury's deliberation regardless of the jurisdiction's rule on impeachment by jurors"].) In *Durr v. Cook* (5th Cir. 1979) 589 F.2d 891, the defendant was convicted of murder and sought habeas corpus on the ground of juror misconduct, specifically the jury foreman's alleged communication to his fellow jurors of certain extraneous facts going to a critical issue in the case. Although the court recognized that the rule of juror incompetency "represents a strong and legitimate public policy of the state of Louisiana," it concluded that the rule must yield when the defendant presents a substantial claim that his constitutional right to a fair trial may have been violated by jury misconduct and the testimony of jurors is " 'crucial to positively establish [such mis]conduct . . .'." (*Id.,* at p. 893.) The court's reasoning is persuasive. In the present case, also a murder trial, defendant presents a substantial claim that his constitutional right to a fair trial was violated by Knapp's communication to his fellow jurors of erroneous "law" on the critical issue of whether defendant was engaged in a robbery at the time of the killing; the testimony of jurors is crucial to establish such misconduct.

*supra,* 24 Cal.3d at p. 207; *People* v. *Honeycutt, supra,* 20 Cal.3d at p. 156.)

█ In our system of justice it is the trial court that determines the law to be applied to the facts of the case, and the jury is "bound . . . to receive as law what is laid down as such by the court." (Pen. Code, § 1126.) "Of course, it is a fundamental and historic precept of our judicial system that jurors are restricted solely to the determination of *factual* questions and are bound by the law as given them by the court. They are not allowed either to determine what the law *is* or what the law *should be.*" (*Noll* v. *Lee, supra,* 221 Cal.App.2d at pp. 87-88, italics in original.) █ In the case at bar the court correctly instructed the jurors at the very beginning of its charge that "[y]our . . . duty is to apply the rules of law that I state to you to the facts as you determine them," and that "[y]ou must accept and follow the rules of law as I state them to you." Turning to the applicable law, the court correctly instructed the jury on the elements of the crime of robbery, including the requirement that the perpetrator have a specific intent to *permanently* deprive the victim of his property.

In *Honeycutt* we held it "egregious misconduct" for a juror, during deliberations, to consult an outside attorney on certain questions of law involved in the case, even though the advice the attorney gave was largely correct and the errant juror did not convey it to the other members of the panel. We explained, "Such conduct in clear violation of the trial court's admonitions interjects outside views into the jury room and creates a high potential for prejudice. . . . [W]e cannot condone a practice whereby a juror receives outside counseling relative to the applicable law, as to do so would subordinate the court's evaluation of the law to that of the juror's outside source and would be contrary to legislative directives that the court shall instruct on the applicable law (Pen. Code, § 1127) and maintain control of the proceedings (Pen. Code, § 1044)." (20 Cal.3d at p. 157.) Because the prosecution failed to rebut the presumption of prejudice arising from that overt act of misconduct, we unanimously reversed the defendant's first degree murder conviction.[3]

Here Knapp likewise violated the court's instructions and "consulted" his own outside experience as a police officer on a question of law. Worse, the legal advice he gave himself was totally wrong. Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective

---

[3]In accord with *Honeycutt* is *State* v. *Sinegal* (La. 1981) 393 So.2d 684. In that case, the court vacated the defendant's first degree murder conviction because during deliberations the jury had examined an obsolete law book and found an annotation on point. The court reasoned that "the law applied by the jury must come only from the court as law-giver or else defendant does not receive a fair trial." (*Id.* at p. 687.)

reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long service as a police officer, he stated it again and again to his fellow jurors and thus committed overt misconduct.[4]

 The People do not dispute the fact that the Sparks and Barbieri declarations establish serious misconduct. Instead, they argue that subsequent declarations of the same jurors make it "absolutely clear that there was no misconduct." The argument is unconvincing.

The People claim that three statements in the second Sparks declaration show no misconduct occurred. In her original declaration Sparks declared that during deliberations "juror Louis Knapp on several occasions stated to myself and the other jurors that he had been a police officer with the Los Angeles Police Department for over 20 years, and that based on his knowledge of the law as a police officer, the law is that a robbery takes place as soon as a person forcibly takes personal effects from another person, regardless of whether he intends to return the personal effects to the person or whether he, in fact, returns them, and that as soon as Mr. Stankewitz took the wallets of Mr. Burrell and Mr. Whelan at gunpoint shortly before the shooting, Mr. Stankewitz was guilty of robbery even though he intended to return the wallets and even though he shortly thereafter threw the wallets on the ground and Mr. Burrell and Mr. Whelan recovered them."

The first statement relied on in the subsequent Sparks declaration is as follows: "I was not trying to state by the matter included [in my original declaration], conclusively whether Mr. Knapp was either including or discarding the element of intent when he made those statements to the rest of the jury." To the extent this ambiguous statement has any meaning at all, it apparently goes to what Knapp may have *meant* by his statements—certainly not to their contents; it is not inconsistent with, and hence does not affect, the clear testimony in each of the original declarations regarding what Knapp actually *said* to the other jurors. Moreover, insofar as it implicates "the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved" (*People* v. *Hutchinson, supra,* 71 Cal.2d at p. 349), it is inadmissible under Evidence Code section 1150, subdivision (a).

The second statement is as follows: "During deliberation among the jurors, prior to [Knapp's] statements, there was substantial discussion about

---

[4]Our conclusion that Knapp's statement constitutes serious misconduct per se does not implicate the reasoning processes of the jurors any more than a holding that a trial court gave an erroneous instruction implicates the reasoning processes of the judge or jury.

intent as an element of robbery. The jury instruction(s) dealing with the elements of robbery were read and re-read several times during our deliberation." But this statement is not in any way inconsistent with the original declarations and thus does not counter the showing of misconduct. Indeed, it expressly recognizes that Knapp did indeed make the offending statements.

The third statement is as follows: "Juror Knapp adamantly expressed his opinion that the defendant, Laird Gene Stankewitz, formed the intent to steal from Mr. Burrell and Mr. Whelan at the beginning when he (Stankewitz) first confronted the subjects at the gate and observed the money in Burrell's wallet. He (Knapp) further expressed the opinion that everything that happened after that led the defendant (Stankewitz) down the path towards fulfilling his intention." The People maintain this assertion establishes that Knapp's statements were made in a certain factual context. But the factual context is immaterial: what *is* material is that Knapp made the statements, and neither evidence nor argument is offered to show that he did not.

The People next contend that three statements in the second Barbieri declaration show no misconduct occurred. Again the argument is unconvincing.

In his original declaration, Barbieri stated that "Mr. Knapp, on several occasions, made statements to myself and the other jurors, to the effect that he had been a police officer in Los Angeles for over 20 years; that he had a special knowledge of criminal law; and that the law was that Mr. Stankewitz was guilty of robbery as soon as he took the wallets of Mr. Burrell and Mr. Whelan at gunpoint, and his returning the wallets was irrelevant."

The first statement relied on in the subsequent Barbieri declaration is as follows: "Any impressions in my [original declaration] that indicate Mr. Knapp did not include intent as an element in the robbery are erroneous." Like a similar statement in the second Sparks declaration, this statement is not inconsistent with the clear testimony in each of the original declarations as to what Knapp actually said to the other jurors, and to the extent it goes to what Knapp may have meant it is inadmissible under Evidence Code section 1150, subdivision (a).

The second statement is as follows: "Mr. Knapp gave the impression to me that if the intent to rob Mr. Burrell and Mr. Whelan was there, it did not matter if their wallets were returned or not returned by Mr. Stankewitz." This statement, however, is not inconsistent with the clear testimony in each of the original declarations. But even if this evidence had some bearing on the issue before us, it would plainly be inadmissible under Evidence Code section 1150, subdivision (a): the "impression" Knapp intended

to convey or Barbieri received necessarily implicates the reasoning processes of individual jurors that can be neither corroborated nor disproved.

The third statement is as follows: "In my [original declaration] . . . I did not make the statement, 'that he (Mr. Knapp) had a special knowledge of criminal law.' I referred to him, stating something to the effect that he was familiar with the law." But the original declaration speaks for itself, and it states otherwise. And even if we were to interpret the quoted statement to mean that Barbieri has changed his testimony, nothing of consequence would result. Whether Knapp advised his fellow jurors that he had "a special knowledge of the criminal law" or merely was "familiar with the law," the fact remains that in erroneously stating the law he vouched for its correctness on the strength of his long service as a police officer.

██ The misconduct of Juror Knapp raises a presumption of prejudice. (*People* v. *Pierce, supra,* 24 Cal.3d at p. 207; *People* v. *Honeycutt, supra,* 20 Cal.3d at p. 156.) Such a presumption is even stronger when, as here, the misconduct goes to a key issue in the case: the resolution of the question whether a robbery took place was critical to the prosecution's felony-murder theory, to the separate robbery count, and to the robbery special-circumstance allegation. (Cf. *People* v. *Hogan* (1982) 31 Cal.3d 815, 847 [183 Cal.Rptr. 817, 647 P.2d 93] [jury's consideration of inadmissible evidence establishing the defendant's reluctance to submit to a lie detector test in a case in which his truthfulness was the key issue].) Finally, "the presumption . . . is even stronger in the context of a capital case." (*Id.* at p. 848.)

██ ██ It is settled that "unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial." (*People* v. *Pierce, supra,* 24 Cal.3d at p. 207, and cases cited.) The People's only attempt to carry that heavy burden in this case is the assertion that "the presumption of prejudice is fully rebutted because both of the jurors make it clear that their decisions fully included a determination concerning petitioner's intent to rob." The effort falls far short of the mark.

First, the argument is without evidentiary support. There is nothing in the second Barbieri declaration to support the claim. And what evidence there is in the second Sparks declaration—"I was not influenced by Juror Knapp in making my decision on how to vote in this matter"—is plainly inadmissible under Evidence Code section 1150, subdivision (a).

Second, even if each of the subsequent declarations could have established that Knapp's serious misconduct did not affect the deliberations of the declarant, no evidence has been offered, admissible or not, to rebut the pre-

sumption that it affected the deliberations of the *other* jurors. Such evidence is, of course, necessary: "it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (*People* v. *Pierce, supra,* 24 Cal.3d at p. 208.)[5]

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated and petitioner is remanded to the Superior Court of Inyo County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision 2. (*In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9 [179 Cal.Rptr. 223, 637 P.2d 690].)

Bird, C. J., Broussard, J., Reynoso, J., Grodin, J., and Kaus, J.,* concurred.

**LUCAS, J.**—I respectfully dissent.

Petitioner (defendant) Stankewitz committed his murder November 3, 1980. Jury trial commenced June 29, 1981, and the jury rendered its guilty verdict September 3, 1981. Subsequently, on September 15, the jury returned its penalty verdict sentencing defendant to death.

More than *three years* later, on November 2, 1984, defendant first raised the issue of possible jury misconduct occurring during the guilt phase deliberations. The majority, excusing the delay as neither presumptively unreasonable nor prejudicial to the prosecution, finds that defendant has proven that jury misconduct occurred, and that the People have failed to rebut the resulting presumption of prejudice to defendant. How, one might ask, were the People expected to rebut that presumption in light of (1) the passage of more than three years from the date of trial, and (2) the substantial evidentiary restrictions imposed by the majority?

The record indicates that defendant, through his appellate counsel, learned of the possible misconduct in March 1983, but nonetheless waited over 18 months before raising the issue. I submit that such inexcusable lack of dil-

---

[5]To judge from the extreme paucity of appellate decisions on the issue, the kind of juror misconduct involved in this case seems to occur only on rare occasions. The misconduct, therefore, is far from being "the very stuff of the jury system" (*United States* ex rel. *Owen* v. *McMann* (2d Cir. 1970) 435 F.2d 813, 818 (per Friendly, J.), cert. den. (1971) 402 U.S. 906 [28 L.Ed.2d 646, 91 S.Ct. 1373]), which courts are understandably inclined to overlook.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

igence should constitute a waiver of the point, absent special circumstances not apparent here. (See *In re Ronald E.* (1977) 19 Cal.3d 315, 322 [137 Cal.Rptr. 781, 562 P.2d 684] [lack of diligence ordinarily fatal to belated habeas corpus claim].) The prejudice to the People is obvious—after more than three years, the jurors' memories regarding the supposed misconduct have dimmed, making it impossible for the People effectively to rebut the presumption of prejudice arising from that misconduct. As Juror Barbieri now observes, he can no longer recall Juror Knapp's exact words on the subjects of robbery and intent; Barbieri now can only recite the "impressions" which Knapp gave to him regarding those issues. But, had defendant raised the misconduct question in a timely fashion, the jurors' recollection of the pertinent events might have been far less "ambiguous" than the majority now finds it. (*Ante,* p. 400.)

Notwithstanding defendant's delay in raising the point, the People attempted to contest the assertion of jury misconduct by submitting more recent declarations by Jurors Sparks and Barbieri. These declarations recite, among other things, that Juror Knapp merely expressed his personal opinion that defendant had formed an intent to steal from the beginning, thereby making it immaterial that at one point he returned the victims' wallets to them. These declarations contradicted these same jurors' original statements, relied on by the majority, which had recited that Knapp had advised the jurors that a robbery occurs upon a forcible taking of property, regardless of the robber's intent to return that property.

The majority rules that the new declarations "implicate the reasoning processes" of Knapp and are accordingly inadmissible under Evidence Code section 1150, subdivision (a). (*Ante,* p. 401.) I disagree for two reasons. First, I see nothing improper in considering the jurors' recital of the *objective fact* of Knapp's statements to the other jurors. (See Evid. Code, § 1150, subd. (a) ["evidence may be received as to statements made" within the jury room].) Section 1150 only excludes evidence "of the effect of such statement" upon the other jurors. (*Ibid.*) Thus, if Sparks' and Barbieri's *original* declarations reciting the facts of Knapp's supposed improper statements were admissible, why weren't these jurors' *subsequent,* clarifying declarations similarly admissible? The majority never explains this glaring inconsistency.

Second, there may exist constitutional objections to the restrictions placed upon the People in this and similar cases, especially in light of defendant's inexcusable delay in raising the juror misconduct issue. The majority finds that juror misconduct occurred and that it created a presumption of prejudice to defendant. Further, the majority holds that the presumption cannot be rebutted by declarations from jurors such as Mrs. Sparks attesting that the

supposed misconduct did not influence their verdict. The majority finds such declarations "plainly inadmissible" under section 1150. (*Ante,* p. 402.) Yet, how do we reconcile that holding with the plain language of article VI, section 13 of the state Constitution, which forbids the reversal of any judgment for *any* error of procedure unless the error has resulted in a "miscarriage of justice"?

In my view, if the jurors agree that supposed juror misconduct played no role in their decision, that fact should be admissible and the judgment affirmed despite the error. Indeed, how else are the People to rebut the presumption of prejudice? To the extent that section 1150 would require a different result, we should hold the section invalid.

I would deny the writ.

On January 16, 1986, the opinion was modified to read as printed above.