307 So.2d 296 (1975)
STATE of Louisiana
v.
Major Lee FORTENBERRY.
No. 55034.
Supreme Court of Louisiana.
January 20, 1975.
Rehearing Denied February 21, 1975.
*297 Leroy Smith, Jr., Mulhearn & Smith, Tallulah, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Thompson L. Clarke, Dist. Atty., John T. Seale, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Defendant was tried under a bill of information and convicted of armed robbery by a twelve man jury. R.S. 14:64. A prior conviction for this crime had been reversed by this court. (Supreme Court Docket No. 54271, decided April 29, 1974). On retrial, defendant was again sentenced to twenty-five years at hard labor. Five bills of exceptions were perfected.

Bills of Exceptions Nos. 1, 2 and 3
These bills were reserved when the trial court permitted the introduction of in-court identifications of the defendant by two eyewitnesses. Defendant contended that previous out-of-court identifications by these witnesses had been made under circumstances so suggestive as to taint any in-court identification and thus violate his right to due process.
On August 4, 1972 about 5:00 p. m. two black men entered Goodrum's Grocery Store in Madison Parish. After asking that some meat be cut for them, one of the men, later identified as the defendant, pointed a .22 caliber pistol at James E. Goodrum, the owner of the store. The other man, later identified as Robinson, armed himself with a meat cleaver from the butcher's counter. The only other person in the store was Alonzo King, an employee of the store. The armed men then took a radio and money from the cash register and from Goodrum; after destroying the telephone, they left. Both eyewitnesses clearly saw the participants, who were not disguised and were within several feet of them.
A few days after the robbery, the two witnesses were asked to come to the sheriff's office to identify two men who were suspected of the crime. Mr. Goodrum then viewed three or four men (the testimony is conflicting) through a one-way mirror; two of the men were suspects. The suspects were much taller than the others and were lighter skinned. The deputy testified that the suspects stood 6' 1" and weighed 165-170 pounds while the other men were about 5' 9" and weighed about 190 pounds. The deputy who conducted the lineup admitted there was no attempt to place the suspects with men of similar physical appearance.
Assuming that the lineup was unduly suggestive, the question arises whether the in-court identification of the defendant was consistent with due process requirements. In State v. Newman, 283 So.2d 756 (La.1973), this court stated the following factors to be considered in determining whether there was a sufficient independent basis for the in-court identification:
"Even if the out-of-court identification was tainted, if the in-court identification had a source independent of the out-of-court identification, the in-court identification does not violate defendant's due process rights. . . . A determination of whether the witness's in-court identification was based on an independent source seems to involve three factors:
"1. The prior acquaintance of the witness with the accused. . . .

*298 "2. Length of time the witness observed the perpetrator before, during and after commission of the offense. . . .
"3. The circumstances under which the observation was made. . . . This consideration should include illumination at the scene, the physical capacities of the witness, and the emotional state the witness was in at the time of observation."
This position was reaffirmed and applied subsequently in State v. Moseley, 284 So.2d 749 (La.1973).
Applying these factors we conclude that the in-court identification had a source independent of the questioned lineup. Goodrum, the victim, was able to observe the defendant in his store over a period of five to ten minutes while defendant held him at gun point and took money from him and the cash register. Goodrum was in a position to make an identification of the defendant which was not based upon the lineup. King, the other eyewitness, testified that he had known the defendant prior to the crime. As King knew the defendant and his confederate, his positive identification was not tainted by any improper procedure.
These bills are without merit.

Bill of Exceptions No. 4
This bill was reserved when the trial court refused defendant's motion for a new trial based upon the fact that the foreman had taken notes during the trial and had used them during the deliberations. The foreman testified that he had taken some notes on a scrap of paper about 1½ × 2" in size. During the deliberations he had referred to them; no one else saw the notes, but other jurors might have seen him refer to them. While C.Cr.P. 793 clearly prohibits the use of notes by any juror, the impeachment of a verdict by a juror is prohibited by R.S. 15:470, as follows:
"No juror, grand or petit, is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member; but every juror, grand or petit, is a competent witness to rebut any attack upon the regularity of the conduct or of the findings of the body of which he is or was a member."
This precise question was before the court in State v. Ledet, 298 So.2d 761 (La.1974). We refused to reverse, holding that the policy of R.S. 15:470 prevailed over that of C.Cr.P. 793 in this situation. Ledet is not distinguishable and we reaffirm our holding.
This bill is without merit.

Bill of Exceptions No. 5
This bill was based upon the alleged exclusion of women from the jury venire. This court has consistently upheld the exemption provided women by Article VII, § 41, La.Const.1921 and C.Cr.P. 402. State v. Stevenson, 292 So.2d 488 (La. 1974).
This bill is without merit.
For the reasons assigned, the conviction and sentence are affirmed.
BARHAM, J., dissents with reasons.
BARHAM, Justice (dissenting).
I respectfully dissent. I cannot join in the majority's disposition of Bill of Exceptions Number 4, which was reserved when the trial court denied defendant's motion for a new trial based on the allegation that the foreman of the petit jury had taken notes during the trial and had used them in the deliberations with the other jurors. In my opinion, the majority errs in its conclusion that State v. Ledet, 298 So.2d 761 (La.1974) is not distinguishable from the case at bar.
*299 In State v. Ledet the majority of this Court held, under the particular facts and circumstances of that case, that note-taking and reference to notes by a juror was not prejudicial error. The majority considered that juror note-taking and reference thereto was a matter which could be inquired into and that evidence taken from a juror could be used to determine whether or not there was prejudicial error.
The facts in the present case and in Ledet differ. The juror in Ledet who had taken the notes and used them during deliberations was not foreman of the jury. It was not indicated in Ledet that the jury members knew that the juror with notes was looking at notes when he discussed the case with them. In Ledet there was testimony that the notes were not used to settle disputes and that the independent recollection of the juror was the only thing relied upon by him in his deliberation.
In the case at hand during the hearing on the motion for new trial the foreman testified without any objection on the part of the State that he took notes during the trial which concerned points that had been made by the State's witnesses and the defense witnesses; that he took the notes into the jury room with him for deliberation; that he used the notes taken in the courtroom and that he referred back to the notes while he and the other jurors were discussing the case. He did not show his notes to the other jurors or allow them to read them, but he admitted that during the deliberation the other jurors could see that he was reading from the notes he had taken during trial.
The greatest difference in this case is that the foreman of the jury stood before that body as they deliberated, and in his discussion of the case, in full view of the other jurors, referred to the notes he had taken during the trial.
In my opinion, the taking of the notes and the reference to them by the juror during deliberations upon the guilt or innocence of the defendant is a substantial violation of a statutory right. La.Code of Criminal Procedure Article 793 prohibits the reference to notes by a juror. It provides:
"* * * He shall not be permitted to refer to notes or to have access to any written evidence. * * *" (Emphasis here and elsewhere supplied).
As the majority said in State v. Ledet,
"The essential reason for the prohibition is that a note-taker may unduly influence the jury by reference to the notes and that, if the notes are inaccurate and incomplete, the parties before the court may be prejudiced by the jurymen's acceptance of them in preference to actual testimony heard by them and their individual memory, if any, of it. * * *"
The majority in Ledet was influenced to some extent by the policy consideration of La.R.S. 15:470, which provides that no juror "* * * is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach * * * any verdict, * * *" of the jury on which he serves.
In Ledet, in a dissenting opinion, the rationale and the methods of impeachment of jury verdicts were discussed at length:

"Impeachment of Jury Verdicts

"The common formula relative to impeachment of jury verdicts has been stated as `a juror's testimony or affidavit is not receivable to impeach his own verdict.' 8 Wigmore, Evidence § 2345 (McNaughton Rev.1961). Wigmore criticizes this rule of thumb as `* * * neither strictly correct as a statement of the acknowledged law nor at all defensible upon any principle in this unqualified form. * * * ` The professor analyzes this general rule in terms of three independent principles dealing with petit jury verdicts.
"1. Privileged communicationsthis relates to the genuine evidentiary privilege *300 protecting communications made between jurors during deliberations.
"2. Parol evidencea verdict, like a contract, is an operative act, and parol evidence rules would render inadmissible negotiations and motives leading up to the act itself.
"3. Self-stultifying testimony (Lord Mansfield's rule)this would forbid any attempt by a juror to prove his own misbehavior, `nemo turpitudinem suam allegans audietur.'
"The scope of the privileged communication principle is limited, mattering only where what was actually said during deliberations is in issue. Acts of misconduct would not be privileged under the principle. Wigmore, supra, § 2346 notes the differences in application of the three principles:
`It remains, however, to notice the practical differences between the application of the present principle of privilege, on the one hand, and, on the other, the ensuing principles of the parol evidence rule and Lord Mansfield's rule:
`(1) The parol evidence rule and Lord Mansfield's rule have their applications only when jurors' testimony is offered to prove facts in some way affecting their verdict. But under the privileged communications rule the juror's testimony would be excluded for any purpose whatever, for example, where upon another trial he was a witness and his bias was offered to be shown by his expressions during retirement with the former jury. The privilege may have a larger scope than the other rules.
`(2) Under Lord Mansfield's rule the juror's testimony is excluded in proving either his own misconduct or a fellow juror's, but under the privileged communications rule the former is obviously not excluded where the juror makes voluntary affidavit. Contrariwise, in the few jurisdictions which do not accept the rule prohibiting proof of misconduct, the juror might still be prevented from disclosing a fellow juror's communications unless the latter consented.
`(3) Under the parol evidence rule and Lord Mansfield's rule the prohibitions, so far as they exist at all, are absolute and independent of the juror's consent, but under the privileged communications rule there is nothing left to prohibit if the privileged juror once consents.
"In applying the parol evidence rule to a jury's verdict, several situations are possible: (a) the jurors' deliberations preceding the verdict, (b) the issues submitted to a jury, (c) the jury's failure to obey formalities of conduct. It is with reference to (c), to which the parol evidence rule would not apply to exclude, that Lord Mansfield's rule has been applied. Wigmore says of this:
`There is, however, a rule of evidence, now generally but improperly accepted, that the fact of informality, so far as it involves improper conduct by the jurors, shall not be proved by one of the jurors themselves. This rule has nothing to do, in principle, with the trial rules of informality nor with the parol evidence rule permitting informalities to be established.' Wigmore, supra, § 2348.
"This doctrine that a witness shall not be heard to allege his own turpitude was applied first to the situation of jury misconduct by Lord Mansfield in Vaise v. Delaval, 1 Term R.11 (K.B. 1785). Before this decision, the unquestioned practice had been to receive jurors' testimony on affidavits without scruple. Wigmore, supra, § 2352; Note, 53 Marquette L.Rev. 258 (1970) at 260-261.
"The actual rule of Vaise distinguished between jurors whose testimony was excluded and third persons whose testimony was not:
`The court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every *301 such case the Court must derive their knowledge from some other source such as some person having seen the transaction through a window or by some other means.'
"Justification for the rule has been based largely on policy reasons. The U. S. Supreme Court in McDonald v. Pless, 238 U. S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), stating that a policy choice must be made between the interest of the litigant in redressing injury and the double public interests of finality of verdicts and freedom and frankness in reaching them, chose the latter.
"However, broad application of this rule has been soundly criticized, especially in the situation where it is misconduct or overt acts which is sought to be proved. See Note, 53 Marquette L.Rev. 263-268; Wigmore, supra § 2353. One of the leading cases distinguishing the application of the broad application of the rule is Wright v. Illinois & Miss. Tel. Co., 20 Iowa 195 (1866). The so-called `Iowa' rule was enunciated:
`While we do not feel entirely confident of its correctness, nor state it without considerable hesitation, yet we are not without that assurance, which, under the circumstances, justifies us in laying down the following as the true rule: That affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner; but that such affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast.
`That the verdict was obtained by lot, for instance, is a fact independent of the verdict itself, and which is not necessarily involved in it. While every verdict necessarily involves the pleadings, the evidence, the instructions, the deliberation, conversations, debates and judgments of the jurors themselves; and the effect or influence of any of these upon the juror's mind, must rest in his own breast, and he is and ought to be concluded thereon by his solemn assent to and rendition of the verdict (veredictuma true declaration). To allow a juror to make affidavit against the conclusiveness of the verdict by reason of and as to the effect and influence of any of these matters upon his mind, which in their very nature are, though untrue, incapable of disproof, would be practically to open the jury room to the importunities and appliances of parties and their attorneys, and, of course, thereby to unsettle verdicts and destroy their sanctity and conclusiveness.
`But to receive the affidavit of a juror as to the independent fact that the verdict was obtained by lot, or game of chance or the like, is to receive his testimony as to a fact, which, if not true, can be readily and certainly disproved by his fellow jurors; and to hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them. The ground upon which affidavits of jurors were excluded in the case of Vaise v. Deleval, supra (which is the leading case and contrary to prior decisions), is not more than satisfactory. Lord MANSFIELD said: "The court cannot receive *302 such an affidavit from any of the jurymen themselves, in all of whom such conduct is a high misdemeanor; but in every such case the court must derive their knowledge from some other source; such as from some person having seen the transaction through a window or by some such other means."
`While it is certainly illegal and reprehensible in a juror, to resort to lot or the like to determine a verdict, which ought always to be the result of a deliberate judgment, yet such resort might not evince more turpitude tending to the discredit of his statement than would be evinced by a person not of the jury, in the espionage indicated by Lord MANSFIELD and necessary to gain a knowledge of the facts to enable him to make the affidavit. At all events the superior opportunities of knowledge and less liability to mistake, which the juror has over the spy, would entitle his statement to the most credit. And if, as is universally conceded, it is the fact of improper practice which avoids the verdict, there is no reason why a court should close its ears to the evidence of it from one of class of persons, while it will hear it from another class, which stands in no more enviable light and is certainly no more entitled to credit.
`Nor does the consideration of the affidavits of jurors for the purposes stated, contravene sound public policy. It is true, however, that public policy does require that when a juror has discharged his duty and rendered a verdict, such verdict should remain undisturbed and unaffected by any subsequent change of opinion upon any fact or pretext whatever; and, therefore, a juror should not be heard to contradict or impeach that which, in the legitimate discharge of his duty, he has solemnly asservated. But when he has done an act entirely independent and outside of his duty and in violation of it and the law, there can be no sound public policy which should prevent a court from hearing the best evidence of which the matter is susceptible, in order to administer justice to the party whose rights have been prejudiced by such unlawful act. In other words, public policy protects a juror in the legitimate discharge of his duty, and sanctifies the result attained thereby; but if he steps aside from his duty, and does an unlawful act, he is a competent witness to prove such fact, and thereby prevent the sanction of the law from attaching to that which would otherwise be colorably lawful.'
"The basic distinction in Wright was between matters which `inhere in the verdict' and those that do not. Stated otherwise, the distinction might be between the motives, methods, or processes by which the verdict was reached and the existence of conditions or occurrences of events bearing on the verdict. State v. Kociolek, 20 N.J. 92, 118 A.2d 812 (1955). See Note, 56 Col.L.Rev. 952 (1956). That the drawing of the distinction may be less than perfectly precise should not detract from the validity of this rule, which at least allows an examination of the particular situation to determine whether the testimony should be admitted, rather than blanket exclusion.
"The approved draft of the ABA Standards relating to Trial by Jury (1968) states:
`5.7 Impeachment of the verdict.
`(a) Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined.
`(b) The limitations in subsection (a) shall not bar evidence concerning whether the verdict was reached by lot.
`(c) Subject to the limitations in subsection (a), a juror's testimony or affidavit shall be received when it concerns:
`(i) whether matters not in evidence came to the attention of one or more *303 jurors, under circumstances which would violate the defendant's constitutional right to be confronted with the witnesses against him; or
`(ii) any other misconduct for which the jurisdiction permits jurors to impeach their verdict.'
"The state law on the subject is discussed by Wigmore, supra, § 2354. Those jurisdictions where the Iowa rule is accepted are: Federal, Florida, Iowa, Kansas, Nebraska, New Jersey, North Dakota, Ohio, Oregon, Tennessee, Texas, Washington, Wisconsin. See § 2354, n. 1. In the other jurisdictions Lord Mansfield's rule seems to be settled law.
"The applicable Louisiana statute is R.S. 15:470, which states:
`§ 470. Jurors incompetent to impeach finding; rebuttal of attacks
`No juror, grand or petit, is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member; but every juror, grand or petit, is a competent witness to rebut any attack upon the regularity of the conduct or of the findings of the body of which he is or was a member.'
"Despite the language, it is submitted that this is not a rule of absolute incompetency, but is rather a reflection of policy. State v. Kifer, 186 La. 674, 173 So. 169 (1937) supports this conclusion. In that case we stated:
`The rule forbidding the juror, whether grand or petit, from impeaching his finding or verdict, is based on public policy, but we think it is equally a matter of public policy, besides being a right expressly granted the accused by law, that "no district attorney or other person shall be present during the deliberations of the grand jury on their findings."
`The reason for this rule is that if the district attorney or any one else should be permitted to be present during the deliberations of a grand jury, the vote of members of the grand jurors might be influence by his presence, and it is our opinion that public policy is more concerned in seeing that no one should interfere with the deliberations of a grand jury during its findings than in preventing its members or the district attorney from testifying in cases of this kind. Moreover, we think that it was not the intention of the Legislature to preclude such testimony under the provisions of articles 470 and 471 of the Code of Criminal Procedure.

`We therefore conclude that the trial judge should have permitted the grand jurors to testify as to whether or not the district attorney was present during their deliberations on the finding of the indictment, which charged the defendant with the crime of rape.'
"Kifer recognizes the conflicting interests involved: That of the litigant seeking individual redress versus that of the public in finality of verdicts and verdicts reached through free and open deliberation. The interest of the individual on balance prevailed and the testimony of the jurors was allowed."
The defendant has a constitutional right to be convicted upon the evidence presented in the jury room. Because the Code of Criminal Procedure sets forth such a strong policy consideration recognizing the adverse effect on the rights of an accused of a juror's reference to notes during deliberation, it appears to me that the action by the foreman of the jury in this case constitutes reversible error. La.R.S. 15:470 permits the drawing of a distinction between an inquiry into the motives, methods, or process upon which the verdict was reached, and an inquiry into the existence *304 of conditions or occurrences of events which affected the verdict. In this case, if the Court is trying to decide which policy consideration should prevail as the overriding expression of legislative will, in my opinion, the Court must conclude that the policy expressed in Code of Criminal Procedure Article 793 is controlling over that of La.R.S. 15:470. The prohibition in the Code against referring to notes can be effectively enforced only by the use of testimony of the jurors themselves. Only the jurors will know whether or not notes were referred to during the deliberations. It is my opinion that reference to notes is an act or occurrence which, in the case at hand, had a bearing upon external conditions of the jury deliberations and on the rendition of a verdict.
There was no objection by the State to the taking of the testimony from the juror in this case. The note-taking juror was not simply one of a panel of twelvehe was the foreman of the jury and had great influence over the deliberations of the jury. There has been a substantial violation of Code of Criminal Procedure Article 793. The redactors of the article must have presumed that prejudice would flow from the act prohibited in the article.
The foreman of the jury admitted that he used notes he had taken while in the courtroom during the trial to clear up points which were being discussed during the deliberations. As he referred to his notes, the other jurors could observe that he was reading from memoranda and were probably influenced to rely upon the recordation of what had been said in the courtroom rather than upon their independent memories. The very prejudice which the majority recognized in Ledet as being the object of Code of Criminal Procedure Article 793's prohibition was exhibited in the case at hand.
In my opinion the conviction and sentence should be reversed. For these reasons, I respectfully dissent.