Filed 8/1/13  Murphy v. Northwest Pump & Equipment CA4/1

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RHONDA MURPHY et al., | D060678 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2009-00089932) |
| NORTHWEST PUMP & EQUIPMENT CO., | MODIFICATION ORDER |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 18, 2013 be modified as follows:

On page 10 of the opinion, reference to the citation "(CalCrim No. 219)" at the end of the first full paragraph should be deleted and replaced with "(CACI No. 219)."

**There is no change in the judgment.**

McCONNELL, P. J.

Filed 7/18/13 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RHONDA MURPHY et al.<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>NORTHWEST PUMP & EQUIPMENT CO.<br><br>Defendant and Respondent. | D060678<br><br><br>(Super. Ct. No. 37-2009-00089932-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven Denton, Judge. Affirmed.

Law Offices of John W. Houts and John W. Houts for Plaintiffs and Appellants.

Wilson, Elser, Moskowitz, Edelman & Dicker, Robert W. Harrison and Kelly A. Van Nort; Bragg & Kuluva and Kenyon M. Young for Defendant and Respondent.

Plaintiffs and appellants Rhonda Murphy and Ronnie Murphy[1] appeal from a judgment following a jury verdict in favor of defendant and respondent Northwest Pump & Equipment Co. on the Murphys' causes of action for negligence and loss of consortium

---

[1] We sometimes refer to the Murphys by their first names for clarity. We intend no disrespect by our use of this shorthand device.

based on allegations that Rhonda Murphy was hit by a falling aluminum retractor pole at a gasoline station where defendant sometimes provided repair services. The Murphys contend there is no substantial evidence to support the jury's special verdict finding that defendant was not negligent, particularly because safety experts for both parties assertedly agreed the pole could only have fallen if defendant's service technicians failed to properly maintain and repair the pump. The Murphys also appeal from the trial court's denial of their new trial motion, arguing the court erred in finding no jury misconduct. We conclude sufficient evidence supports the verdict; further, there was no basis for finding the jury committed misconduct. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We state the facts in the light most favorable to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of defendant. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693-694; see *Thompson v. Miller* (2003) 112 Cal.App.4th 327, 330.)

On May 27, 2007, the Murphys arrived in Ronnie Murphy's vehicle at a gasoline station in El Cajon, California. The gas station pumps required the use of retractor poles and a spring-loaded retractor device at the top. Each 12-pound retractor pole was secured at the base to a foot bracket, and also midway up the pole by a bolt located inside the gas pump housing fastened with a nut and lock washer. The bolt was only visible when the faceplate was removed from the pump.

2

*Surveillance Video Evidence*

Surveillance video from the gas station taken at the time of the incident shows the Murphys' vehicle pulling up to the pump, where Rhonda removes the nozzle and hands it to Ronnie. While Ronnie was holding the nozzle in order to pump gas, one of the aluminum retractor poles fell. The pump blocks the surveillance camera's view of where and how the pole ultimately fell. Rhonda bends forward briefly out of the camera's view, then moves back into view standing up. She next walks into the convenience store, speaks to the cashier, walks back to the vehicle, and afterwards returns to the convenience store.

*The Gas Station Pumps' Repair History*

Eleven days before the incident, Bobby Tellez, a service technician employed by defendant, replaced a cracked footing on the subject pump and did a pump test to ensure it was running correctly. He checked to ensure the footing was securely fastened to the retractor pole, and the bolts at both locations were secure. Tellez pulled on the retractor pole vigorously, grabbing and pulling the hose five or six times. The gas station also conducted daily inspections, including testing each retractor by pulling the hose. Nobody complained about looseness or problems with the pole in the days before the incident. After Tellez replaced the footing, defendant was not called to the gas station for any work until the day after the May 27, 2007 incident.

Defendant made only one repair to a different retractor pole at the gas station, and it occurred in March 2007. Specifically, Tellez stated in notes that he "resecured hood to dispenser," and conducted a site inspection.

*The Murphys' Trial Testimony and Medical Testimony*

The Murphys filed suit against the gas station operator, the gasoline pump manufacturer and defendant. The matter proceeded to a jury trial against defendant on causes of action for negligence and loss of consortium. At trial, Ronnie testified he left his vehicle and went inside the station to pay, while Rhonda picked up the gas pump nozzle. According to Rhonda, as she looked for the vehicle's gas tank, the retractor pole struck her in the head and back, the nozzle struck her in the breast bone, and her hands went into the rear of the vehicle. Ronnie testified he saw the pole lying across Rhonda's back, and she was pinned against the vehicle. The Murphys claimed that Ronnie lifted his vehicle's tailgate and helped Rhonda into the back, where she remained when they drove away. Within a half hour of the incident, Ronnie had a friend take pictures of Rhonda's back and the pump. Five days later, Rhonda went to a doctor.

Defendant presented medical experts who testified Rhonda's injuries did not stem from the May 2007 incident. They also presented evidence that in April 2002, Rhonda fell three floors out of a building onto a cement sidewalk while under the influence of alcohol, amphetamines and methamphetamine. She was in a coma for several months, shattered her elbow, broke her pelvis and tail bone, fractured her cervical spine and sustained a brain injury. She had been unable to work since that 2002 fall.

4

Over a year after the May 2007 incident, Rhonda wrote her doctors that she was cooking, housecleaning, exercising and handling her own personal hygiene. In 2008, she submitted a sworn declaration in connection with a custody dispute and stated she was "somewhat disabled" but could "do everything but drive a car." Though Rhonda claimed she required a walker after the May 2007 incident, she arrived at the first session of her deposition in April 2010 without a walker.

*Expert Testimony Regarding Repair of Gas Station Pumps*

The Murphys' safety expert Peter Zande opined the defendant's conduct fell below the applicable standard of care because defendant failed to install and maintain a safe system for customers to pump gas. In his opinion, defendant failed to determine the cause of the required repair to the pump; rather, Tellez made the repair without significant analysis or investigation. Zande saw nothing indicating the defendant had notified the gas station of a problem needing inspection and monitoring. He noted that Tellez and another of defendant's employees, Will Skoff, both stated that they simply make repairs without ascertaining the root problems. Zande admitted that the documents he reviewed did not show a widespread problem with loosening of the retractor poles, or that anyone else was ever injured by a falling retractor pole. Zande also admitted he did not know who designed or manufactured the retractor pole or footing.

Defendant's mechanical engineer expert, Bernd Givon, was asked at trial, "Based on your investigation, everything you reviewed and your background, do you have an opinion as to how long that footing [on the pump at issue here] should last if the

5

assembly system you described is properly maintained?" He replied that "it should last forever." He also was asked, "Do you have an opinion as to whether or not that failure would have happened, the one on [May 27, 2007], had Mr. Tellez done a proper repair?" He replied, "The opinion is that it would not."

Defendant's mechanical and metallurgic failure analysis expert, Gerald Zamiski, testified the gas station pole fell due to vibration and loading causing a nut backing off over time from one of the bolts fastened through the mid-height portion of the pole. Zamiski stated the pole remained in place because the bolt was stuck in a hole. When Rhonda pulled the hose away from the pump in a certain direction, the bolt fell out of the hole and the pole fell.

According to Zamiski, Tellez conducted a reasonable inspection of the pump on May 16, 2007, and after Tellez replaced the foot bracket and resecured the pole, there were no indications of looseness or other problems with the pole in the intervening days before the claimed incident. Zamiski said that Tellez and defendant's other employees received on-the-job training that was not lacking in any respect. He testified that the gas station's daily inspections were also reasonable; he understood the assistant manager tested each retractor daily and also pulled on the hoses. Zamiski saw no record of complaints from customers or from the assistant manager's daily checks indicating that the pole was loose, and he explained that a loosened bolt "should show signs of looseness before it separates." Zamiski viewed the videotape of the incident and did not see the pole fall on Rhonda; it appeared to fall in front of her.

6

In June 2011, the jury, by a 10 to 2 vote, reached a special verdict finding defendant was not negligent.   The Murphys unsuccessfully moved for a new trial, and the trial court thereafter entered judgment in defendant's favor.  The Murphys timely appealed.[2]

## DISCUSSION

### I

The Murphys contend experts from both plaintiff and defendant established defendant acted negligently; therefore, the jury was bound by that finding.  They point specifically to the fact that on recross-examination, Zamiski was asked, "If the midlevel bolt and footing are properly installed and maintained, there's no reason that pole would ever fall, is there?"  He replied, "The answer is yes, it would not."

### A. *Applicable Law*

The issue of whether there is sufficient evidence to support the trial court's judgment is governed by a well-established and narrow standard of review.  We do not weigh conflicts or disputes in the evidence.  The jury is the trier of fact and sole judge of witnesses' credibility.  Even if different inferences can reasonably be drawn from the evidence, we may not substitute our own inferences or deductions for those the jury

---

[2]     The Murphys' notice of appeal states they appeal from the judgment as well as the trial court's order denying a new trial.  As they point out however, the latter order is not separately appealable, but reviewable on appeal from the underlying judgment. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 161, fn. 5.)

made. Our authority begins and ends with a determination of whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the judgment. (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 697; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) "[T]he test is not the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Howard v. Owens Corning*, *supra*, at p. 631.)

The jury, however, may elect to reject an expert witness's testimony: "Thus, 'as a general rule, "[p]rovided the trier of fact does not act arbitrarily, [it] may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]" [Citation.] This rule is applied equally to expert witnesses.' " (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 632.)

On this point, one appellate court has clarified: "The *exceptional* principle requiring a fact finder to accept uncontradicted expert testimony as conclusive applies *only* in professional negligence cases where the standard of care must be established by expert testimony. In such instances, 'the plaintiff must prove by members of the defendant's profession the standard of care or skill ordinarily used in the practice of that profession at a particular place' [citation]; only *then* may this 'standard of care, when

8

testified to by experts who are uncontradicted, . . . be conclusively shown by such testimony.' [Citation.]" [¶] "Because the instant case does not present any issues of professional negligence or medical malpractice, there was no reason to require the trier of fact to accept as 'conclusive' the uncontradicted testimony of appellants' experts.  Instead, the general rule applies." (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at pp. 632-633.)

Here, the court instructed the jury on how to interpret expert witness testimony. (CACI No. 219.)  The court also instructed the jury with CACI No. 401 regarding the elements of a negligence cause of action:  "Negligence is the failure to use reasonable care to prevent harm to oneself or to others.  [¶]  A person can be negligent by acting or by failing to act.  A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation."  (CACI No. 401.)

B.  *Analysis*

We conclude substantial evidence supported the jury's finding defendant was not negligent, and the weight of that evidence was not undermined by any presumed inconsistency in Zamiski's expert testimony that if the midlevel bolt and footing were properly installed and maintained, there is no reason the pole would ever fall.  The evidence consisted of testimony that 11 days before the incident, defendant made the last repair to the gas station pumps and had securely fastened the footing to the retractor pole of the pump and pulled on it to ensure it was secure.  Afterwards, the gas station

9

conducted daily tests, and found no other problem, and received no other complaints. The history of repairs at the gas station also failed to disclose negligence on the defendant's part. Zamiski testified that based on his review of the defendant's records, defendant exercised reasonable care.

Murphy's contention that: "[T]he testimony from both parties' lay and expert witness was completely consistent: [defendant's] service technicians' negligence in failing to properly repair and maintain [the pump] caused the pole apparatus to fail," is unavailing in light of the above substantial evidence. Moreover, the court instructed the jury on how to evaluate an expert's testimony: "You do not have to accept an expert's opinion. As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's testimony. In deciding whether to believe an expert's testimony, you should consider: [¶] a. The expert's training and experience; [¶] b. The facts the expert relied on; and [¶] c. The reasons for the expert's opinion." (CalCrim No. 219.)

## II.

The Murphys contend the court erroneously denied their new trial motion brought on grounds of jury misconduct. The Murphys specifically contend: (1) the jurors incorrectly believed defendant was required to have notice of a dangerous condition; and (2) the jurors rushed to judgment—without any substantial deliberations—thus

10

demonstrating their haste was "almost certainly motivated by the desire of jurors to end the trial immediately."

A. *Background*

Murphy supported his new trial motion with the jury foreperson's declaration stating that the jury retired for deliberation at 4:15 p.m. on June 14, 2011. Before the trial exhibits were provided to them, the jury immediately took a vote and decided by a vote of 10 to 2 that defendant was not negligent. The first question on the verdict form, which stated, "Was Northwest Pump & Equipment Company negligent?" directed the jury to stop deliberating if its answer was no. The jury ended deliberations at 4:30 p.m. that day. The next day, the jury assembled at 9:00 a.m. The exhibits were brought into the jury room at approximately 10:00 a.m., and by 10:15 a.m., the jurors had taken another vote and reached their verdict with the same lineup of votes.

The foreperson declared, "There was some although [not] thorough discussion of the case, the evidence, or the exhibits." The foreperson also stated in the declaration, "Several of the jurors stated that there was no evidence of negligence because Defendant Northwest Pump and Equipment Co. did not have any 'notice' that there was a problem with the pump retractor pole because it had never happened before, there or anywhere else." The foreperson concluded, "I felt a sense among the jurors that due to previous personal commitments and after two weeks of testimony, [the jurors] favored a hurried decision in the case."

B. *Applicable Law*

11

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute." (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.) Code of Civil Procedure section 657 identifies seven grounds for a new trial motion, including jury misconduct. When a party seeks a new trial based on jury misconduct, the court undertakes a three-step inquiry. First, the court must determine whether the declarations offered in support of the motion are admissible under Evidence Code section 1150.[3] If they are, the court must next consider whether the facts establish misconduct. Finally, assuming misconduct is found, the court must determine whether it was prejudicial. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112-113; *People v. Hord* (1993) 15 Cal.App.4th 711, 724.) "Juror misconduct raises a rebuttable presumption of prejudice." (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining

_____

[3]    Only evidence of " 'objective facts' " is admissible to prove juror misconduct. (*In re Stankewitz* (1985) 40 Cal.3d 391, 397.) Evidence regarding how such objective facts may have influenced jurors' subjective thought processes is inadmissible to impeach a verdict. (Evid. Code, § 1150, subd. (a).) "Thus, jurors may testify to 'overt acts' —that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror.' " (*In re Stankewitz*, at p. 398.) "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

party resulting from the misconduct."  (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

Whether juror misconduct has occurred is "a legal question we review independently."  (*People v. Collins* (2010) 49 Cal.4th 175, 242, fn. omitted.)  However, we " 'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' "  (*Ibid*.)  Similarly, whether misconduct is prejudicial is reviewed independently as a mixed question of law and fact when the trial court denies a motion for new trial.  (*People v. Ault* (2004) 33 Cal.4th 1250, 1260-1263.)  "One of the elements of a defendant's right to trial by jury includes the requirement that jurors deliberate before reaching a verdict."  (*People v. Bowers* (2001) 87 Cal.App.4th 722, 733.)

We reject Murphy's contention that the jurors refused to deliberate.  Our opinion in *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905 is controlling.  In that case, the jury took a straw vote to see how they each viewed the first question on the verdict form.  Ten of the jurors agreed on an outcome, and they decided to render a verdict rather than discuss the issue further.  (*Id*. at pp. 909, 912.)  We stated, "This procedure is a type of 'deliberations,' in that each juror—having considered the evidence and arguments independently—is setting forth his or her opinion, albeit without accompanying reasons or explanations."  (*Id*. at p. 912.)  We addressed the claim the jurors rendered the verdict before the exhibits were delivered to the jury room, noting:  "No argument is made that they did not have an opportunity to view any specific pertinent exhibit prior to retiring for

13

deliberations.  Nor is there any indication of any overt conduct or statements showing jurors failed to properly perform their duties to pay attention during trial and consider all the evidence presented or that any jurors were compelled to render a vote before they were ready to do so."  (*Ibid*., fn. omitted.)

Here, based on the jury foreperson's declaration stating there was "some . . . discussion of the case, the evidence, or the exhibits," we conclude the jury did deliberate. On this record, the foreperson's qualifier that the discussion was not thorough is of no moment because there is no concomitant claim that any juror was denied an opportunity to fully participate in the deliberations.  For the same reason, and because it invades the subjective thought processes of the jurors, we do not upset the jury's verdict based on the foreperson's opinion that the jurors "favored a hurried decision in this case" due to their "previous personal commitments."

Murphy supports his claim of jury error by relying on the foreperson's declaration that some jurors stated that defendant's lack of notice of a problem with the retractor pump precluded a finding of negligence.  Murphy claims that under the applicable jury instructions, no requirement of notice exists for a defendant to recover for general negligence.  We reject Murphy's claim, because it impermissibly intrudes on the jurors' mental processes.  "[Evidence Code section 1150] may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations.  In rare circumstances a statement by a juror during deliberations may itself

14

be an act of misconduct, in which case evidence of that statement is admissible. [Citation.]  But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150."  (*People v. Hedgecock* (1990) 51 Cal.3d 395, 418-419.)

Based on the above, we conclude the court did not err in denying the Murphys' motion for a new trial.

## DISPOSITION

The judgment is affirmed.  Northwest Pump & Equipment Company is awarded costs on appeal.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

15