Filed 7/30/14  P. v. Kimani CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>         Plaintiff and Respondent,<br><br>v.<br><br>EPHANTUS KIMANI,<br><br>         Defendant and Appellant. | A138975<br><br>(Del Norte County<br>  Super. Ct. No. CRPB125137) |

After a jury trial defendant Ephantus Kimani was convicted of possessing a weapon (a sharp instrument) while confined in state prison (Pen. Code, § 4502[1]).  In a bifurcated court proceeding, defendant admitted he had suffered a prior strike conviction within the meaning of the Three Strikes law (§ 667, subds. (b) – (i), 1170.12).  After denying a motion to strike the prior strike conviction (§ 1385), the court sentenced defendant to state prison for an aggregate term of six years (middle term of three years doubled for the prior strike conviction).  On appeal defendant contends the trial court erred in denying his motion for a new trial based on allegations of juror misconduct during deliberations.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.     Trial Proceedings

On November 8, 2012, the Del Norte County district attorney filed an information charging defendant with one count of possessing a weapon (sharp instrument) while

---

[1]      All further unspecified statutory references are to the Penal Code.

confined in state prison on May 25, 2012. The one-day jury trial commenced on January 14, 2013 at 8:38 a.m. A jury was chosen and the court gave opening instructions. The court informed the jury, "we're going to go to around 12:00. If it's not a convenient place to quit at 12:00, we may quit a few minutes before or a few minutes after. [¶] And I don't think that we'll still be in session at 5:00, but normally we would quit at 5:00 or sometime around there. If you're in deliberations, generally my rule is you can stay and deliberate as long as you choose to as long as all twelve of you choose to. If any one person needs to leave at 5:00 because you have family commitments or any other reason, then you all leave at 5:00, but if all twelve of you agree that you want to stay late, you can do that. That's totally up to you. I would ask that you let me know when you're going to come back."

The prosecutor called one witness Jonathan Cantieri. He testified that on May 25, 2012, he was working as a correctional officer at Pelican Bay State Prison. At 6:00 p.m., he and several other officers conducted a random search of the inmates in a "day room," where 30 to 40 inmates are allowed to associate for "about an hour" each day. As defendant walked toward the officers to be searched, Cantieri noticed something in defendant's sock. The officer made defendant face the wall, placed him in handcuffs, and removed an object from his sock. The object, which was referred to as a bindle, was a latex glove finger; once the latex was removed, the officer found toilet paper wrapped around the tip of "an inmate-manufactured weapon," "definitely" made of a plastic material. The officer described the plastic item as a weapon because "it's sharpened to a point . . ." and could be used to inflict harm on the staff and other inmates. The officer conceded he did not know what was inside the latex glove finger until he unwrapped it. He assumed the bindle "was a weapon because of the weight and the heaviness of it, firmness of it." On cross-examination, the officer testified he did not know who made the weapon or wrapped it in toilet paper and put latex around it, how long the bindle was in defendant's sock, or whether or not defendant ever saw the weapon in its unwrapped condition. Photographs of the "weapon" after it was unwrapped and the actual "weapon" were admitted into evidence as exhibits. The parties stipulated that "the defendant

2

admitted at an administrative hearing to being in possession of a bindle that contained the items depicted in the exhibits."

After closing arguments and the court's instructions, the jury commenced its deliberations at about 3:30 p.m. At about 4:00 p.m., the court received a note from the jury asking "to review the court transcript regarding what the defendant stipulated to or stated in the administrative hearing about his knowing that he possessed or carried on his person a sharp object." The court directed the court reporter to read to the jury that portion of the transcript concerning the stipulation. At about 4:30 p.m., the jury sent a second note again asking for the same "read back" because they did not agree "about what they just heard, so they want[ed] it read back again." This time, the court responded by giving the jurors a written version of the stipulation. At 5:15 p.m., the court reconvened after being notified that the jury had reached a verdict. As directed by the court, the clerk read the verdict and polled the jurors. The jurors each confirmed that the verdict as read was their true and correct verdict.

## B. Motion for New Trial

Before sentencing, defendant filed a motion for a new trial on the ground of juror misconduct during deliberations (§ 1181, subd. (4)[2]), and in the interests of justice. In support of his motion, defendant submitted a declaration from Juror No. 4, who stated, in pertinent part, as follows: "[¶] 3. Following the presentation of the case, the Jury retired to the jury room and took an immediate vote. . . . [¶] 4. The jury continued to deliberate. At around 5:00 p.m., the vote was 9 for guilty and 3 for not guilty. I was one of the three for not guilty. [¶] 5. One of the 'not guilty' jurors was a young man that said he needed to be home by 5:30 so that he could give his mother a ride somewhere. He announced that if they were not done by 5:30 he would forever lose use of the family vehicle. He

---

[2]     Section 1181, subdivision 4, provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] . . . [¶] . . . [¶] 4. When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors . . . ."

changed his vote to guilty so that he could be home by 5:30. [¶] 6. The 9 jurors pressured me and the other hold outs to change our opinions. [¶] 7. I did not believe that the prosecution met its burden that [defendant] 'knowingly' possessed a weapon beyond a reasonable doubt. I believed that there was insufficient evidence presented that [defendant] knew what was inside the bindle that he had on his person. [¶] 8. The other juror[s] wanted to go home. I was led to believe that we needed to reach a unanimous verdict or we would have to continue to deliberate day after day until a unanimous verdict was reached."

In opposing the motion, the prosecutor asked the court to consider a transcript of an interview with Juror No. 4, conducted on March 29, 2013, at which both defense counsel and a representative of the district attorney's office questioned the juror. At that interview, Juror No. 4 explained that when the jurors first came into the jury room, they immediately took a vote, everyone said how they would vote (guilty or not guilty) and then everyone spoke regarding why they would so vote. Each juror that had originally voted not guilty ultimately changed their decision. Juror No. 4 did not know why the other jurors who had originally voted not guilty changed their opinions. The jurors who were voting guilty "were pressuring everybody to go guilty." When asked to describe exactly what or how the jurors were pressuring her, Juror No. 4 replied, "Well, they were pressuring everybody, you know? 'What was your reason?' " When asked if other jurors protested the " 'pressure,' " Juror No. 4 said that two other jurors, a young man and a young woman, said "it's like, 'Okay, fine. We'll change our vote. But it doesn't matter. I feel he's not guilty.' " Just before the jurors took a secret written ballot, Juror No. 4 was still verbally expressing her belief that "they[ ][had not] made their case," and the young woman still wanted more evidence, but the young man was not "still saying that it was Not Guilty," because "they got him to change." Juror No. 4 did not know why the young woman ultimately changed her vote. During the secret paper ballot process, each juror wrote "Guilty." When asked why she changed her verdict when she was still of the opinion that defendant was not guilty, Juror No. 4 initially said: "Well, the young boy said, 'I have to hurry up and get out of here. I have to pick my mom up by 5:30.' We

4

were back in the court room by 5:15 or so." Juror No. 4 later stated that she did not know why she wrote guilty on the secret ballot. She "wanted to put Not Guilty but then [she] didn't want everybody else to say, 'Okay, why are you doing this to us? Why are you making it longer . . . ' " Because there were only two jurors who were undecided just before the secret ballot, Juror No. 4 felt the other jurors would know if she voted not guilty. She felt if she voted not guilty that the other jurors would still focus on her and not the other hold-out juror. The other jurors did not know how Juror No. 4 would vote on the secret ballot and the other jurors were "pressuring more" on the other hold-out juror because that juror said she needed more evidence. Juror No. 4 did not believe she would have to stay until the jury reached a verdict. But, when asked what she thought would happen if there was not an unanimous decision, Juror No. 4 said, "They didn't wanna come back. They wanted it done and over with and that's when the boy goes, 'I need to get out of here by 5:30,' and the other jurors verbally expressed, "I don't wanna come back,' or 'We don't wanna come back.' "

At a May 23, 2013 hearing, the court tentatively ruled it would deny defendant's motion for a new trial as it did not see any "allegations of any misconduct by jurors." What the court saw was "people indicating they felt pressured or whatever. I saw absolutely nothing that indicated to me that there was any misconduct." The court noted that "a lot of the evidence and the statements by the declarant juror was basically mental processes and those are things that I don't think I can consider." Because the prosecutor's opposition was filed late, the court granted defendant additional time to file a reply.

In further support of his motion for a new trial, defendant offered no additional evidence addressing his claim of juror misconduct during deliberations. Instead, he submitted a declaration from his defense counsel who argued that the court should grant a new trial on the additional ground that Juror No. 4 had broken her promise to follow the court's voir dire instructions to afford defendant the presumption of innocence and only render a guilty verdict on a showing of proof beyond a reasonable doubt.

5

At a June 13, 2013, hearing, the court stated that its tentative ruling to deny defendant's motion for a new trial had not changed. In so ruling, the court explained: "I did not see any proof of misconduct. I read the declaration from [defense counsel] who argues apparently that a juror deliberately did not intend to follow the Court's instructions during voir dire. I found absolutely no evidence of that whatsoever. Even if, as argued, that the juror did not follow the instructions, which I don't believe has been established, there's absolutely no evidence that she intentionally misled the Court during voir dire. [¶] As previously indicated, the Court cannot consider discussions of mental processes. It's not allowable. The Court can consider actual allegations of facts with regard to something that was done wrong, but not how that might have affected the mental processes of the juror. I simply have no hint that the juror deliberately did not intend to follow instructions during jury selection. [¶] So for the reasons previously indicated, as well as what I've just said now, it's my intention to deny the motion for a new trial."

## DISCUSSION

Defendant challenges the denial of his motion for a new trial on the ground that he adduced evidence that one juror voted to convict him so that the juror could return home by a certain hour and that other jurors had expressed their desire to go home and not return the next day for further deliberation. According to defendant, "[t]he court improperly excluded this evidence under Evidence Code section 1150, as concerning only the juror[s'] mental processes," but "the evidence consisted of overt acts admissible under Evidence Code section 1150, and which demonstrated the juror[s'] refusal to follow the court's instructions. This refusal amounted to prejudicial misconduct and the remedy is remand for a new trial." We conclude defendant's contentions are unavailing.

"When a party seeks a new trial based upon jury misconduct, a [trial] court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. (See Evid. Code, § 1150, subd. (a).) If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether

6

the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion." (*People v. Perez* (1992) 4 Cal.App.4th 893, 906.)

In addressing the admissibility of evidence in support of a motion for a new trial, the trial court is guided by Evidence Code section 1150, which provides, in pertinent part: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions or events, occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (*Id.*, subd. (a).) " 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' " [Citations.] ' "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' " (*People v. Danks* (2004) 32 Cal.4th 269, 302, quoting *People v. Steele* (2002) 27 Cal.4th 1230, 1261, quoting *People v. Hutchinson* (1969) 71 Cal.2d 342, 349.) Thus, "when considering evidence regarding the jurors' deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 418; see *In re Stankewitz* (1985) 40 Cal.3d 391, 398 (*Stankewitz*).) As explained by the court in *Stankewitz*, although a trial court may consider "statements made . . . within . . . the jury room" (Evid. Code, § 1150), the statements "must be admitted with caution. Statements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors – e.g., what the juror making the statement meant and what the juror hearing it understood. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny.

But no such misuse is threatened when . . . the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*Stankewitz, supra*, at p. 398 [court found misconduct when a juror communicated a statement of law to the other jurors that was not given in the court's instructions].) "But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of these processes is barred by Evidence Code section 1150." (*Hedgecock, supra,* at p. 419; see *Danks, supra,* at p. 302 [juror's reasons for voting for death penalty cannot be considered in deciding motion for a new trial based on juror misconduct during deliberations].)

*People v. Cox* (1991) 53 Cal.3d 618 (*Cox*) is instructive on the rule enunciated in *Stankewitz.* In *Cox*, defendant sought a new trial contending he could proffer evidence that "jurors were told not to smoke at the table while they were deliberating because the nonsmoking jurors were bothered by it; and that they refused to follow that order and did smoke causing some jurors to be intimidated and change their votes;" and "[a]t one point the jury was hung seven for death and five for life; and one of the jurors for death told the life jurors that if they held out the jury would be locked up for three weeks; and this influenced some of the jurors to change their votes." (*Id*. at p. 693.) In concluding that such proffered evidence would not sustain a motion for a new trial, the Supreme Court explained: "[W]e must reject the allegations of misconduct predicated on the intimidation of nonsmoking jurors and the expressed desire of some jurors to resolve the penalty and avoid prolonged deliberations, to the extent they clearly implicate 'fellow jurors' mental processes or reasons for assent or dissent.' " (*Id*. at pp. 694-695.) "[W]hile the *conduct* of jurors disregarding an agreement on smoking or complaining about the pace of deliberations may be scrutinized, the *effect* of this conduct on subsequent votes may not be. When we exclude the latter, the former, standing alone, does not implicate juror misconduct; nor does the record otherwise demonstrate that some members of the jury

8

were prevented from freely expressing their views because of these two circumstances." (*Cox, supra*, at p. 695.)

In keeping with both *Stankewitz* and *Cox*, we conclude the trial court here reasonably gave no consideration to Juror No. 4's statements that one juror changed his vote from not guilty to guilty "so that he could be home by 5:30." Having properly rejected evidence implicating the juror's reason for his vote, the trial court was left only with evidence that during deliberations one juror stated he had to leave by 5:30 p.m. and some of the jurors stated they did not want to return another day for further deliberation. Those comments, standing alone, do not constitute "overt acts" of jury misconduct requiring a new trial. (*Cox, supra,* 53 Cal.3d at p. 695; see *Continental Dairy Equip. Co. v. Lawrence* (1971) 17 Cal.App.3d 378, 385, 387 [affidavits that "several of the jurors wanted to get it over with and to go home since they were tired due to the length of the trial" held to be insufficient to warrant new trial as the statements "dealt with and had the effect of proving the mental processes or reasons and subjective considerations which influenced their verdict and did not constitute competent evidence to impeach the verdict"]; *People v. Cook* (1955) 136 Cal.App.2d 442, 446 [statements by "fellow-jurors" that "the jury would be locked up over the weekend if they should fail to arrive at a verdict . . . [do] not constitute such pressure as would deflect the integrity and honor of a citizen"].)

We also see no merit to defendant's claim that the jurors' comments as described by Juror No. 4 demonstrate that members of the jury either explicitly or implicitly intended or agreed to ignore the court's instructions "not to vote merely to reach a verdict or consider factors outside the scope of the evidence." Unlike the situations in the cases cited by defendant, in this case there was no evidence of an explicit intention or agreement to ignore the court's instructions. Juror No. 4 did not state that any juror expressly announced that his or her reason for voting guilty was to end deliberations or to allow a juror to leave by 5:30 p.m. Additionally, contrary to defendant's contention, the trial court was not required to infer an implicit intention or agreement by one or more jurors to not follow the court's instructions because one juror said he needed to be home

9

be 5:30, that juror changed his vote shortly before making that statement, and other jurors expressed their desire not return the next day for further deliberation. Rather, the trial court could reasonably find as it did that the jurors' alleged comments did not demonstrate they had "surrendered their conscientious convictions on a material point, or reached their verdict by compromise." (*People v. Stevenson* (1970) 4 Cal.App.3d 443, 445.)

In sum, we uphold the denial of the motion for a new trial as defendant has failed to show the trial court abused its discretion in ruling there was no admissible evidence of juror misconduct during deliberations.

## DISPOSITION

The judgment is affirmed.

 

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.